## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NUCOR CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES | ) Before: Hon. Mark A. Barnett, |
| Defendant, | ) Chief Judge |
| and | ) Court No. 22-00070 |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | ) NONCONFIDENTIAL |
| Defendant- Intervenor. | ) Business Proprietary Information Removed from Pages 3, 4, 14, 15, 17, 19, and 23. |

### <u>DEFENDANT-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel for the Government of the Republic of Korea*

Dated: November 21, 2022

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES.................................................................................... ii

INTRODUCTION ................................................................................................... 1

ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED................... 1

STATEMENT OF ISSUES ..................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 1

STANDARD OF REVIEW ..................................................................................... 5

ARGUMENT .......................................................................................................... 6

I.     Commerce's Assessment Of The Adequacy Of Remuneration Is Lawful........................ 6

       A.     Commerce Has Discretion in Deciding How to Assess the Adequacy of
              Remuneration ....................................................................................... 6

       B.     Commerce's Approach Is Lawful .......................................................... 8

II.    Commerce's Findings Regarding The Adequacy Of Remuneration Are Supported
       By Substantial Evidence ........................................................................... 13

       A.     Record Evidence Demonstrates that the Korean Electricity Market Is
              Governed by Market Principles ............................................................ 14

       B.     The Costs Upon Which Commerce Relied Are Not Tainted ................... 16

       C.     The Government Prices to POSCO Reflected the Cost of Electricity
              Generation Plus a Return on Investment ............................................... 18

CONCLUSION..................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) .................................................................................. 6

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)............. 5

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................................... 15

*CS Wind Vietnam Co. v. United* States, 832 F.3d 1367 (Fed. Cir. 2016)......................................... 5

*Hyster Co. v. United States*, 858 F. Supp. 202 (Ct. Int'l Trade 1994)......................................... 13

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)....................................... 5

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................... 5

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019)........................................7, 8, 11, 14

*POSCO v. United States*, 556 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ....................................... 11

*POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) .................... 11, 13, 14, 19

*POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) ........................... 11, 12, 23

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ................................................... 6

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................................... 6

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ....................................................... 5

*Verizon Commc'ns Inc. v. Fed. Commc'ns Comm'n,* 535 U.S. 467 (2002) ................................. 14

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................ 5

19 U.S.C. § 1677(5)(E)(iv) ........................................................................................... passim

19 U.S.C. § 1677f-1(e).................................................................................................... 9

28 U.S.C. § 1581(c) ...................................................................................................... 5

**ADMINISTRATIVE DETERMINATIONS**

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022) ........................................................................................ 1

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ............................................................................................ 10

*Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) ...................................................................................................................................... 10

*Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) .. 10

**REGULATIONS**

19 C.F.R. § 351.503(b)(1) ...................................................................................................... 9

19 C.F.R. § 351.511(a)(2) ...................................................................................................... 7

19 C.F.R. § 351.511(a)(2)(i) .................................................................................................. 9

19 C.F.R. § 351.511(a)(2)(ii) ................................................................................................. 9

**OTHER AUTHORITIES**

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ...........................................7, 11, 15

## INTRODUCTION

This brief is submitted on behalf of the Government of the Republic of Korea ("GOK") in response to the arguments raised by Plaintiff, Nucor Corporation (hereinafter "Plaintiff"), relating to alleged errors of law and analysis committed by the U.S. Department of Commerce ("Commerce") in the 2019 administrative review of the countervailing duty ("CVD") order on Carbon and Alloy Steel Cut-to-Length ("CTL") Plate from the Republic of Korea.  *See* Pl. Nucor Corp.'s Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 29 ("Pl. Br.").

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Plaintiff challenges certain aspect of Commerce's final results in the 2019 administrative review of the CVD order on CTL plate, published as *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022) (P.R.231) ("*Final Results*").

## STATEMENT OF ISSUES

1.      Whether Commerce's assessment of the adequacy of remuneration for electricity provided by the GOK is in accordance with law.

2.      Whether Commerce's determination that the GOK did not subsidize POSCO through the provision of electricity for less than adequate remuneration ("LTAR") is supported by substantial evidence on the record.

## STATEMENT OF FACTS

The GOK adopts Defendant the United States' ("the Government's") statement of facts, but provides additional facts relevant to this appeal.

During the course of the underlying proceeding, the GOK responded to questionnaires regarding the alleged provision of electricity for LTAR.  *See* Letter from Lee & Ko to Sec'y of

Commerce, "Administrative Review of the Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Response to New Subsidy Allegation Questionnaire" (Apr. 27, 2021) ("GOK NSA QR") (C.R.229-234/P.R.115); Letter from Lee & Ko to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Supplemental Questionnaire Response" (June 22, 2021) ("GOK 1st SQR") (C.R.280-290/P.R.149-154); Letter from Lee & Ko to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Second Supplemental Questionnaire Response" (July 21, 2021) ("GOK 2nd SQR") (C.R.311-320/P.R.170-173); Letter from Lee & Ko to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Third Supplemental Questionnaire Response" (July 21, 2021) (C.R.321/P.R.174).

Therein, the GOK noted that most electricity in Korea is generated by six subsidiaries of the Korea Electric Power Company ("KEPCO") referred to as "GENCOs," although some electricity is also generated by independent power generators and community energy systems. GOK NSA QR at 4, 6 (C.R.229/P.R.115).  However, none of these generation companies directly transmits or distributes electricity to consumers, as KEPCO is the exclusive supplier of electricity in Korea.  *Id.* at 4-5.  KEPCO purchases electricity from the generation companies via the Korea Power Exchange market ("KPX") for distribution to the ultimate customer.  *Id.* at 4-5.

The GOK also provided information establishing that KEPCO's tariff schedule applicable for the period of review ("POR") set electricity prices sufficient to cover costs, including those related to electricity generation, plus profit.  The GOK noted that, by law, KEPCO is required to

establish tariff rates at levels that recover the aggregate costs for supplying electricity.  *Id.* at 8-11.

Further, record evidence establishes that, in 2019, KEPCO earned profit more than sufficient to cover costs (including for the generation of electricity), plus a return on investment. *Id*. at 12.  First, the GOK submitted to Commerce information related to KEPCO's operating expenses (i.e., cost to purchase electricity, labor costs, grid maintenance fees, and other fees not related to the sales of electricity), and demonstrated how its income covers its costs, plus a return on investment.  *Id.* at 14-20 (C.R.229/P.R.115), Exhibit E-18 (C.R.232/P.R.115); GOK 2nd SQR at Exhibit E-18.2 (C.R.312-314/P.R.170).  The GOK explained in detail how KEPCO calculates its return on capital (i.e., rate of return).  *See* GOK 1st SQR at 11-16, 32-36 (C.R.282/P.R.149). In addition, the GOK submitted the outside audit report of KEPCO's overall cost for electricity (GOK 1st SQR at Exhibit E-22 (C.R.289/P.R.154)) and provided a fulsome explanation regarding how the results of this audit report connect to the expenses and income the GOK reported.  *See* GOK 1st SQR at 29-31 (C.R.282/P.R.149).  Based on this information, the GOK demonstrated that KEPCO's cost recovery rate in 2019 for **[**

**].**  GOK NSA QR at 18-20 (C.R.229/P.R.115), Exhibit E-18 (C.R.232/P.R.115); GOK 2nd SQR at Exhibit E-18.2 (C.R.312-314/P.R.170).

The GOK also provided information regarding the price at which KEPCO purchases electricity from the KPX to demonstrate that these prices were sufficient to cover the cost of electricity production, plus a return on investment for the electricity generators.  This price is determined by a formula: (1) the marginal price, which is the amount calculated to compensate the generation companies for fuel costs, the principal component of the variable costs of generating electricity; (2) the capacity price, which is calculated to compensate the generation

companies for fixed costs related to constructing generation facilities; and (3) the adjustment coefficient, which is calculated to prevent KEPCO's overpayment to certain generation companies with low fuel costs and to maintain a differential between the expected rate of return between the GENCOs and KEPCO.  GOK NSA QR at 29-32 (C.R.229/P.R.115).

Finally, the GOK provided information substantiating that the price at which KEPCO purchased electricity via the exchange was sufficient to compensate the GENCOs.  The GOK first noted that KEPCO is legally required to pay the GENCOs the amount to (i) recover their total costs (including fuel, maintenance, and administrative costs) and (ii) pay their interest for loans.  GOK 1st SQR at 19 (C.R.282/P.R.149).  The GOK explained [


] (*id.* at 19-22), and the GOK provided detailed information regarding the GENCOs' actual profit/loss information related to electricity activities [


].  GOK 1st SQR at 17-18 (C.R.282/P.R.149), Exhibit E-25 (C.R.289/P.R.154); GOK 2nd SQR at 13-15 (C.R.311/P.R.170), Exhibit E-38 (C.R.314/P.R.170). The GOK also placed the financial statements of the six generation companies on the record (GOK 2nd SQR at Exhibit E-41 (C.R.316-320/P.R.171-173)).

POSCO also responded to questionnaires regarding the alleged provision of electricity for LTAR.  Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Electricity New Subsidy Allegation Questionnaire Response" (Apr. 27, 2021) ("POSCO NSA QR") (C.R.235-244/P.R.117); Letter from Morris, Manning & Martin, LLP to Sec'y of Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Second Supplemental Questionnaire Response" (May 19, 2021)

("POSCO 2nd SQR") (C.R.271/P.R.141).  POSCO explained which tariff classifications covered

its purchases of electricity and provided the tariff rates applied to its electricity purchases, the

total amount purchased at different rates (by month and time), and total amount paid to KEPCO.

POSCO NSA QR at 2-4, Exhibits NSA-2 (C.R.241/P.R.117), NSA-4 (C.R.244/P.R.117)).

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1581(c).  The Court "shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *CS Wind Viet. Co. v. United* States, 832 F.3d 1367, 1373

(Fed. Cir. 2016) (internal quotation marks omitted).  A party challenging Commerce's finding for

lack of substantial evidence "has chosen a course with a high barrier to reversal."  *Nippon Steel*

*Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks omitted).

The Court reviews Commerce's interpretation of the statutes it administers under the two-

step framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

467 U.S. 837 (1984).  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir.

2016).  The Court first "must determine whether Congress has directly spoken to the precise

question at issue."  *Id.* (internal quotation marks omitted).  If it has, the Court "must give effect

to the unambiguously expressed intent of Congress."  *Id.* (internal quotation marks omitted).  If it

has not, Commerce's "interpretation governs in the absence of unambiguous statutory language

to the contrary or unreasonable resolution of language that is ambiguous."  *United States v.*

*Eurodif S.A.*, 555 U.S. 305, 316 (2009).  In such circumstances, "{a}ny reasonable construction

of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

The Court must also ensure that Commerce has complied with its own regulations, but defers to Commerce's "interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of {Commerce}'s intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

In terms of Commerce's choice of methodology in reaching its conclusions under the CVD law, "{a}s long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

## ARGUMENT

## I.   COMMERCE'S ASSESSMENT OF THE ADEQUACY OF REMUNERATION IS LAWFUL

Plaintiff argues that Commerce's finding that the GOK did not provide electricity for LTAR was unlawful.  Pl. Br. 12-18.  Plaintiff fails to show that Commerce's finding is inconsistent with the statute or regulation.

### A.   Commerce Has Discretion in Deciding How to Assess the Adequacy of Remuneration

Under the statute, "{a} benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The statute further directs that "the adequacy of remuneration shall be

6

determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review." *Id.* "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* The statute does not define what constitutes "adequate remuneration."

Commerce has issued regulations regarding how it will determine whether remuneration is adequate, setting forth a three-tiered, hierarchical approach. 19 C.F.R. § 351.511(a)(2). This case involves Commerce's "tier-iii" methodology. Under Commerce's tier-iii methodology, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id.* The regulation, however, does not specify how Commerce will make that assessment. When it issued the regulation, Commerce explained in the Federal Register notice that, "in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) ("*Preamble*"). Commerce further stated that

> we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.

*Id.* These statements in the *Preamble* reflect a focus on how the price "was set" and demonstrate that Commerce did not intend to adopt a rigid framework for assessing "whether the government price was set in accordance with market principles." *Id.*

The Court of Appeals for the Federal Circuit ("Federal Circuit") has held that the statute and Commerce's implementing regulation require "ensuring that the government authority's price is not too low considering what the authority is selling." *Nucor Corp. v. United States*, 927 F.3d 1243, 1254 (Fed. Cir. 2019). The Federal Circuit also has emphasized that this principle

7

still "leaves a large range of potential implementation choices." *Id.* "Commerce has

considerable prima facie leeway to make a reasonable choice within the permissible range, and

properly justify its choice, based on the language and policies of the countervailing-duty statute

as well as practicality and other relevant considerations." *Id.* at 1255.

**B.**    **Commerce's Approach Is Lawful**

Commerce assessed whether the government price was consistent with market principles

by determining whether the electricity prices charged by KEPCO allow for the recovery of costs,

plus a rate of return. Memorandum from James Maeder to Lisa Wang, "Issues and Decision

Memorandum for the Final Results of Countervailing Duty Administrative Review: Certain

Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea; 2019" (Jan. 31, 2022)

("*Final IDM*") at 21-22 (P.R.227). In conducting that analysis, Commerce examined the

electricity rates and costs for the tariff classification applicable to POSCO. Memorandum from

James Maeder to Christian Marsh, "Decision Memorandum for the Preliminary Results of the

Countervailing Duty Administrative Review, 2019: Certain Carbon and Alloy Steel Cut-to-

Length Plate from the Republic of Korea" (July 30, 2021) ("*Preliminary IDM*") at 31-32

(P.R.179). Plaintiff does not show that Commerce's methodology falls outside the "large range"

of permissible choices for implementing the statutory and regulatory standard. *Nucor Corp.*, 927

F.3d at 1254-55.

Plaintiff asserts that the "{t}he statute, the regulation, and Commerce's practice . . .

confirm that the basis of the LTAR benefit analysis is the price actually paid by the respondent to

the government supplier for the input under consideration." Pl. Br. 14; *see also id.* at 12-14.

Plaintiff then claims that Commerce "ignored the prices paid by the respondents to the

government supplier in determining whether a benefit exists," *id.* at 14, which Plaintiff argues is

unlawful, *id.* at 14-18. Plaintiff's arguments are flawed.

First, the authorities cited by Plaintiff do not address how Commerce is to determine whether goods "are provided for less than adequate remuneration" pursuant to 19 U.S.C. § 1677(5)(E)(iv) under the tier-iii methodology, 19 C.F.R. § 351.511(a)(2)(iii).  Plaintiff cites the statutory requirement that Commerce determine "individual countervailable subsidy rates."  Pl. Br. 12 (quoting 19 U.S.C. § 1677f-1(e)).  This provision does not address how Commerce should determine whether remuneration is adequate, and Commerce complied with this provision by calculating an individual rate for POSCO in the *Final Results*.  *Final Results*, 87 Fed. Reg. at 6,843 (showing that Commerce calculated subsidy rate of 0.42% for POSCO).  As to electricity specifically, Commerce considered the specific tariff rates applicable to POSCO and then used the company's actual electricity purchases and sales information to calculate a benefit amount (which was ultimately determined to be non-measurable) when Commerce found that certain tariff rates were not set in a manner consistent with market principles.  *See Preliminary IDM* at 31-32 (P.R.179); POSCO Preliminary Calculation Memorandum at 9-10 and Attachment II (C.R.323-324/P.R.180).

Plaintiff also cites 19 C.F.R. § 351.503(b)(1) and § 351.511(a)(2)(i)-(ii).  Section 351.503(b)(1) describes how Commerce will measure the benefit for programs not addressed elsewhere in its regulations.  Section 351.503(a) provides that, if there is a specific rule for the measurement of a benefit elsewhere in its regulations, then Commerce "will measure the extent to which a financial contribution . . . confers a benefit as provided in that rule."  Commerce has a separate regulation specifically providing for its tier-iii methodology, and thus § 351.503(b)(1) is irrelevant.  Plaintiff's citations to § 351.511(a)(2)(i)-(ii) are similarly inapposite, because they describe Commerce's tier-i and tier-ii methodologies, wherein Commerce's first step is to select a price as a benchmark to measure the adequacy of remuneration.  This case involves

Commerce's application of the tier-iii methodology, which applies when such prices are not available.

Plaintiff's case law citations similarly do not support Plaintiff's argument. As the Government noted, Plaintiff mainly cites cases involving the tier-i or tier-ii methodologies, which are inapposite. As Commerce previously has explained, the tier-iii methodology is distinct and "more complicated" than the other methodologies "because *the Department is no longer solely examining prices, but assessing how the government sets it prices* and whether the mechanism by which it determines its prices is consistent with market principles." *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), accompanying Issues and Decision Memorandum at 17-18 (emphasis added).

Plaintiff cites *Certain Cold-Rolled Steel Flat Products from Russia* as well as *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015), which at least involved the tier-iii methodology. Pl. Br. 13-14. But the cited passages discuss how Commerce constructed a benchmark in order to calculate a benefit amount *after* Commerce had already determined that the government prices were not set consistent with market principles, not Commerce's threshold assessment of whether the government set prices in a manner that is consistent with market principles. In any event, the *Preamble* makes clear that Commerce intended to retain flexibility as to how it would apply the tier-iii methodology. Thus Commerce's approach for constructing a particular benchmark in those cases in no way precludes the methodology that Commerce adopted in this case.

The only case that Plaintiff cites that would be directly relevant to the issue here is Commerce's remand results in the *POSCO* litigation. Pl. Br. 12. Ultimately, Commerce applied

fundamentally the same methodology for assessing whether the setting of government prices was consistent with market principles in that case as in this case, and Commerce's remand results were upheld by this court. *See Final IDM* at 22-23 (P.R.227); *POSCO v. United States*, 556 F. Supp. 3d 1364, 1370-71 (Ct. Int'l Trade 2022). Commerce has employed a similar framework to analyze KEPCO's pricing in other Korea CVD cases, which likewise have been sustained. *See Final IDM* at 22-23 (P.R.227); *see also POSCO v. United States*, 581 F. Supp. 3d 1272 (Ct. Int'l Trade 2022) (sustaining analysis of whether electricity rates were set in accordance with market principles based on KEPCO's cost recovery); *POSCO v. United States*, 557 F. Supp. 3d 1290 (Ct. Int'l Trade 2022) (same).

Second, Plaintiff fails to acknowledge Commerce's explanation for how it would apply its tier-iii methodology when it issued the regulation. Commerce explained that it would look at how "the government price was established," or, as Commerce also phrased it, how "the government price was set." *Preamble*, 63 Fed. Reg. at 65,378. The electricity prices were not set specifically for POSCO. Rather, the tariff rates paid by POSCO were generally applicable to the companies in its electricity consumption classifications, and the prices were established for those classifications. Among the factors that Commerce said it might consider in a tier-iii analysis were "the government's price-setting philosophy" and "costs (including rates of return sufficient to ensure future operations)." *Id.* Given that the rates are broadly applicable, it is unclear how Commerce could examine the government's "price-setting philosophy" without looking at how the rates were set generally. The Federal Circuit also has upheld Commerce's use of a tier-iii analysis to determine the adequacy of remuneration for electricity based on "familiar standards of cost recovery" similar to the one employed in this case. *See Nucor Corp.*, 927 F.3d at 1254. Given that the electricity rates were established for the classification instead of

individual companies, it was reasonable and appropriate for Commerce to consider the GOK's price-setting philosophy and its costs as they related to each tariff classification generally in assessing whether prices charged for electricity constitute adequate remuneration.

Plaintiff also asserts that "Commerce's methodology gives governments *carte blanche* to engage in harmful cross-subsidization" and claims that the benchmarks Commerce constructed for certain electricity rates that were found to not be set in accordance with market principles demonstrates such cross-subsidization. Pl. Br. 17-18. As explained further in the section addressing Plaintiff's substantial evidence arguments, *infra*, Korean electricity prices (and electricity prices generally) are affected by supply and demand considerations that vary over the course of a day and over the course of a year. Plaintiff's comparison of the average off- and mid-peak purchases made by POSCO—the prices for which would be affected by the time of day when electricity was consumed—to a single, annual average cost ignores the prevailing market conditions for electricity in Korea that distort such a comparison. The statute demands that "the adequacy of remuneration shall be determined in relation to prevailing market conditions." 19 U.S.C. § 1677(5)(E)(iv). As this court has previously stated, "it would seem that setting lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'" *POSCO*, 581 F. Supp. 3d at 1281.

Moreover, POSCO was subject to the same rate structure as the other industrial users in the classifications analyzed by Commerce, and it purchased electricity during on-peak, mid-peak, and off-peak periods. POSCO NSA QR at Exhibit NSA-2 (C.R.241/P.R.117); *Preliminary IDM* at 31 (P.R.179). Plaintiff makes no claims that that there is cross-subsidization between industrial users. Further, it stretches logic to conclude that the GOK is cross-subsidizing POSCO *by charging the same prices* to other, similarly situated electricity customers. Under Plaintiff's

theory, the same tariff paid by POSCO would constitute excessive remuneration when charged to other industrial users, which is nonsensical. Commerce's evaluation of those broadly applicable rates based on the classification level as a whole was reasonable.

Commerce's apples-to-apples comparison of average annual costs and average annual prices allowed it to determine that the rates paid by POSCO, which are the same rates paid by other companies in its classifications, were based on market principles and thus reflect adequate remuneration for the electricity provided. Although Plaintiff "may have preferred for Commerce to have used a different analytical model," Commerce's methodology "permitted it to make the necessary statutory findings," and "it is Commerce, as the administering agency, that is to determine the analytical approach to establish whether a countervailable subsidy exists." *POSCO*, 557 F. Supp. 3d at 1301; *cf. Hyster Co. v. United States*, 858 F. Supp. 202, 206 (Ct. Int'l Trade 1994) ("It is not for this Court to direct Commerce to choose one methodology over another where both methodologies are reasonable. While plaintiffs articulate another possible methodology, they fail to demonstrate to the Court how the methodology used by Commerce is unreasonable, not based on substantial evidence or not in accordance with law."). Commerce's methodology accordingly should be sustained.

## II.    COMMERCE'S FINDINGS REGARDING THE ADEQUACY OF REMUNERATION ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff further argues that Commerce's finding that some electricity prices were in line with market principles and thus conferred no benefit is unsupported by substantial evidence. Pl. Br. 18. As detailed by the Government, the record demonstrates that Commerce collected and evaluated relevant evidence regarding whether KEPCO set electricity prices according to market principles, and its decision regarding this issue is supported by substantial evidence.

Plaintiff's arguments are largely based on objections regarding the methodology Commerce adopted in conducting its analysis.  However, Commerce has broad authority to determine which methodology to employ in its tier-iii analysis.  The Federal Circuit has noted that a "great variety of methodologies {have been} used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as 'fair value'), some on various measures of 'cost' (which may reflect value)."  *Nucor Corp.*, 927 F.3d at 1254-55 (*citing Verizon Commc'ns Inc. v. FCC,* 535 U.S. 467, 484-86 (2002)); *see generally Verizon*, 535 U.S. at 477-89.  Therefore, Commerce "has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations."  *Nucor Corp.*, 927 F.3d at 1255.  Again, just because Plaintiff "may have preferred for Commerce to have used a different analytical model" does not mean that Commerce's conclusions are unsupported by substantial evidence.  *POSCO*, 557 F. Supp. 3d at 1301.  For the reasons discussed below, Plaintiff's arguments otherwise are without merit.

### A.    Record Evidence Demonstrates that the Korean Electricity Market Is Governed by Market Principles

Plaintiff first argues that record evidence demonstrates the Korean electricity market is not governed by market principles.  However, record evidence supports Commerce's conclusions.

In addition to Commerce's findings regarding KEPCO and the KPX, which were detailed by the Government, Commerce closely reviewed the GENCOs' reported profits and losses during the POR, including the GOK's explanation regarding [

], and detailed information regarding the GENCOs' actual profit/loss information

14

related to electricity activities [                                                    ].  *See* GOK

1st SQR at 20-23 (C.R.282/P.R.149), Exhibit E-25 (C.R.289/P.R.154); GOK 2nd SQR at 13-15

(C.R.311/P.R.170), Exhibit E-38 (C.R.314/P.R.170), Exhibit E-41 (C.R.316-320/P.R.171-173).

Based on its review of the GENCOs' financial performance, Commerce concluded that the

GENCOs, too, recovered their costs and a rate of return in 2019.  *Preliminary IDM* at 30

(P.R.179).  It is clear that Commerce thoroughly analyzed the information on the record and that

there is substantial evidence supporting its determination that KEPCO set electricity prices in

accordance with market principles.

      Plaintiff argues otherwise.  However, Plaintiff fails to even establish that Commerce

*could* have drawn another conclusion from the record evidence, which would be insufficient to

require Commerce to reverse its decision in any event.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S.

607, 620 (1966) ("{T}he possibility of drawing two inconsistent conclusions from the evidence

does not prevent {the agency}'s finding from being supported by substantial evidence.").

Instead, Plaintiff erroneously focuses on irrelevant facts.

      Plaintiff begins its argument by comparing Korea's energy usage to that of other

developed countries and describing the high energy intensity of the Korean economy.  Pl. Br. 18-

19.  Plaintiff provides no explanation as to how these alleged facts are relevant to the issue at

hand.  These facts do not address factors such as "the government's price-setting philosophy

{or} costs (including rates of return sufficient to ensure future operations)" and are therefore

unrelated to Commerce's analysis regarding whether prices were set in accordance with "market

principles."  *Preamble*, 63 Fed. Reg. at 65,378.  Further, focusing on other energy markets in the

world completely ignores the "prevailing market conditions" within the Korean market itself,

which is in direct contradiction of the statute.  19 U.S.C. § 1677(5)(E)(iv).

Plaintiff then goes into a lengthy discussion regarding how the electricity market in Korea is owned, operated, directed, and controlled by the government through KEPCO.  Pl. Br. 19-20.  Again, however, this is completely irrelevant to Commerce's analysis.  Even assuming that Korea's electricity market is "controlled" by the government (which the GOK does not concede), this would not establish that KEPCO is providing electricity for LTAR.  The tier-iii methodology is used precisely in such situations—i.e., where the government is the sole provider of a good or service—and is necessary *because* the mere fact that the government is the sole supplier in a market does not in and of itself lead to the conclusion that the prices within the market are inconsistent with market principles.  A proper assessment of prices charged is required to determine compliance with market principles.  Commerce did that here.

Thus, Commerce has properly reviewed the evidence on the record, and its conclusion that certain electricity prices were in line with market principles and therefore conferred no benefit is supported by substantial evidence.  Plaintiff's assertions to the contrary are without merit.

**B.    The Costs Upon Which Commerce Relied Are Not Tainted**

Plaintiff next takes issue with Commerce's evaluation of the cost dataset on the record, asserting that the cost data provided by the GOK do not "reflect the actual costs of electricity generation and supply," and arguing that Commerce's reliance on the reported data was therefore erroneous.  Pl. Br. 21.  Again, however, Commerce's determination that cost data submitted by the GOK reflect the actual cost of electricity generation and supply is supported by substantial record evidence.

Record evidence establishes that KEPCO and the GENCOs cover their costs plus a sufficient rate of return.  As detailed by the Government, Commerce examined KEPCO's costs and was "able to trace the costs and the rate of return," and it determined—based on record

16

evidence—that the KPX's standardized price setting methodology covers costs and "includes consideration of the GENCOs' and KEPCO's rate of return." *Preliminary IDM* at 30-31 (P.R.179).  Further, as explained above, Commerce separately reviewed the financial results of the GENCOs during the POR and concluded that the GENCOs recovered their costs.  *Id.* at 30.  In this way, Commerce's conclusion is supported by substantial record evidence.

Plaintiff takes issue with Commerce's analysis, claiming that "cost data that the GOK provided . . . does not reflect the actual costs of electricity generation and supply."  Pl. Br. 21.  This position is unfounded.  As an initial matter, Plaintiff inaccurately asserts that Commerce failed to collect information regarding the actual cost of generation and supply from the generators themselves, and—instead—relied solely on the price mechanism establishing the prices KEPCO pays to purchase electricity through the KPX in its evaluation of cost.  Pl. Br. 21.  This is incorrect.  As discussed above, Commerce evaluated the financial position of the six GENCOs, including by gathering data in multiple questionnaire responses and considering the GENCOs' financial statements.  GOK NSA QR at 4-6 (C.R.229/P.R.115); GOK 1st SQR at 20-23 (C.R.282/P.R.149), Exhibit E-25 (C.R.289/P.R.154); GOK 2nd SQR at 13-15 (C.R.311/P.R.170), Exhibit E-38 (C.R.314/P.R.170), Exhibit E-41 (C.R.316-320/P.R.171-173).  Based on this thorough evaluation, Commerce concluded that the GENCOs recovered their costs during the POR.  *Preliminary IDM* at 30 (P.R.179).

Further, Plaintiff fails to cite to any evidence that suggests that these electricity prices were *not* set to cover costs plus a rate of return.  Plaintiff first argues that KEPCO's cost datasets were based on **[                                                                      ]**.  However, this in no way establishes that the reported costs were inaccurate.  Plaintiff also objects to the pricing mechanism applied by the KPX, which it claims "operates in practice as an *ad hoc*

reallocation of revenue based on the financial performance of KEPCO and individual generators at the time that it is established." Pl. Br. 21.  This is an unsubstantiated assertion by Plaintiff that does nothing to establish that KEPCO's costs are distorted.  In fact, even if true, Plaintiff's argument would be irrelevant to Commerce's analysis.  Commerce's analysis focuses on whether the prices charged are sufficient to cover costs plus a rate of return; as long as this is the case, it is irrelevant how the supplying entity allocates profit.  The record shows that the GENCOs recovered their actual costs, as did KEPCO, and that the rates were set to allow KEPCO and the GENCOs a rate of return.  Plaintiff identifies no evidence that suggests the cost data on the record are not accurate.

Based on the above, it is clear that Commerce has properly reviewed the evidence on the record, and its reliance on cost data on the record is reasonable and supports Commerce's determination.  Plaintiff's argument is without merit.

### C.    The Government Prices to POSCO Reflected the Cost of Electricity Generation Plus a Return on Investment

Finally, Plaintiff claims—incorrectly—that the electricity prices paid by POSCO did not cover the cost of electricity generation.  Pl. Br. 22-24.  However, in making this argument, Plaintiff distorts Commerce's benchmark analysis and completely disregards prevailing market conditions, which render Plaintiff's comparisons unreasonable.

Plaintiff maintains that a proper methodology would compare the average cost of supply for a particular tariff classification to the prices POSCO paid based on time of use and provides calculations that it contends demonstrate that the prices paid by POSCO did not cover the cost of production plus a return on investment.  Pl. Br. 22-24.  These calculations are fundamentally flawed.  As an initial matter, and as discussed above in Section I.B, it was reasonable and appropriate for Commerce in its analysis to consider the GOK's price-setting philosophy for the

*tariff classification* instead of evaluating the rates paid by individual companies given that the electricity rates were established for the classification and not for individual companies.  Plaintiff disregards this fact.

Further, Plaintiff's analysis suffers from two additional flaws: first, Plaintiff inconsistently cherry-picks data to support its position; and, second, Plaintiff completely ignores prevailing market conditions in the Korean electricity market.  In its analysis, Plaintiff selectively identifies POSCO's [                    ], noting that it paid annual average off-peak and mid-peak prices under the [                                        ] electricity rate classification of [                    ] and [                            ], respectively.  Pl. Br. 22.  Plaintiff then concludes that these prices do not cover the costs of electricity generation as KEPCO's reported average unit cost of supply for this electricity rate classification was [

          ].  *Id.*

This court has already concluded that Plaintiff's price comparisons relying on cherry-picked data are insufficient to establish that Commerce's analysis or conclusions are not supported by substantial evidence:

> Nucor's price comparison also lacks merit.  Nucor seeks to compare the lowest monthly average off-peak price paid by the respondents for certain months of the POI to the lowest annual average unit price paid to a KEPCO generator. . . . Given that the KPX set prices on an hourly basis . . . , Nucor's inconsistent cherry-picking of data fails to demonstrate that the respondents paid less for their respective electricity consumption than was necessary to allow the generators to recover the costs of supplying that electricity and it does not call into question Commerce's analysis or conclusions.

*POSCO*, 557 F. Supp. 3d at 1300-01.  In the instant case, Nucor's comparisons are just as flawed: again, Nucor focuses on the off-peak and mid-peak prices (for [                ]), but then compares these prices to KEPCO's average costs for supplying electricity to all customers within

the relevant classification at all times of day.  The Court should continue to conclude that Nucor's price comparison in this case is unpersuasive.

Further, it is nonsensical to compare an *average* cost to time-specific prices established based on varying costs of production, and doing so fails to take into account the prevailing market condition in the Korean electricity market.  As electricity is consumed immediately rather than being stored, the relationship between supply and demand is heavily affected by the time of day.  The KPX's pricing formula takes into account the "marginal price of electricity *at a given hour* at which the projected demand for electricity and the projected supply of electricity for such hour intersect."  GOK NSA QR at Exhibit E-2, p. 36 (C.R.229/P.R.115) (emphasis added). When demand is low, KEPCO sources electricity for distribution from the lowest-cost generators (e.g., nuclear or coal), thereby meriting a lower price to the downstream customers; when demand is high, KEPCO has to source electricity from higher-cost generators as well (e.g., oil and/or liquefied natural gas ("LNG")), thereby requiring a higher price from its downstream customers.  *Id*.  In turn, the tariff rates charged by KEPCO take these prevailing market conditions into account by establishing different tariff rates based on the time of day.  *Id.* at Exhibit E-10 (C.R.232/P.R.115).  Therefore, if Commerce were to rely on the comparison suggested by Plaintiff, it would be ignoring prevailing market conditions in the Korean electricity market in a way that contravenes the statute.

The data on the record allowed Commerce to compare the revenue generated from the tariffs charged to companies within a classification against the annual average cost for supplying electricity to that tariff classification.  This comparison accounts for the prevailing market conditions in Korea, as it incorporates the average cost for generating and distributing electricity for all times of day for all periods of the year to the average revenue generated from supplying

electricity at the applicable rates at all times of day for all periods of the year.  The comparison also reflects how the tariff rates were set, which was for classifications instead of individual companies.  Commerce will take into account factors affecting comparability between the government and benchmark prices even when applying its tier-i or tier-ii methodologies. 19 C.F.R. § 351.511(a)(2)(i)-(ii) (stating that, in identifying a tier-i benchmark, Commerce "will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability," and Commerce will make "due allowance for factors affecting comparability" when applying tier-ii methodology).  It is thus reasonable for Commerce to also take the comparability of the cost and price data into account when using its tier-iii methodology, and it did so here based on the data it had available on the record.  Commerce has discretion in choosing how to measure the adequacy of remuneration, and the methodology chosen in this case, which ensures an apples-to-apples comparison between costs and revenues, was reasonable.

Finally, Plaintiff claims record evidence suggests that "KEPCO has structured its electricity prices to maintain subsidies to large industrial users like steel producers, while recouping losses on those sales through higher prices to other users."  Pl. Br. 22-23; *see also* Pl. Br. 17.  However, not only does Plaintiff provide no data to support this assertion, it relies on a misstatement of Commerce's analysis.  First, Plaintiff argues that "{b}asing the analysis on KEPCO's total revenues *on all sales to all customers* effectively launders the benefit conferred by subsidized prices by offsetting them with revenues on sales at non-subsidized prices to other consumers."  Pl. Br. 23 (emphasis added).  In fact, Commerce did not compare total revenues on *all sales to all customers*; it compared revenue on sales to *large industrial users*, i.e., the classification Plaintiff argues is being subsidized.  *Preliminary IDM* at 31 (P.R.179).

Second, Plaintiff provides no data substantiating its claim and also mischaracterizes the conclusions discussed in the news articles it provides as support. *See* Pl. Br. 23 (citing Nucor's May 11, 2021 Comments at Exhibits 5 and 6 (C.R.265/P.R.138)). First, Plaintiff claims that an analysis by the Korean National Assembly established that "KEPCO provided more than KRW 10 trillion in benefits to large companies through the provision of below-cost electricity between 2014 and 2019." *Id*. However, even Plaintiff acknowledges that this analysis compared only the off- and on-peak prices charged to industrial users. Nucor's May 11, 2021 Comments at Exhibit 5 (C.R.265/P.R.138). The Korean National Assembly's analysis said nothing about KEPCO's recovery rate for industrial users overall. Plaintiff cites another article describing a report by the Korean Energy Economics Institute, which also compared the off- and on-peak rates for industrial users. *Id.* at Exhibit 6. Under Plaintiff's theory, therefore, KEPCO is subsidizing industrial users by charging them the exact same tariff-based price, which is nonsensical. Instead, Commerce's evaluation of those broadly-applicable rates based on the classification level as a whole was reasonable, and Commerce rightly found that "there is no basis to conclude that this {subsidization} is taking place." *Final IDM* at 26 (P.R.227). Plaintiff fails to establish that the evidence suggests otherwise.

The GOK has demonstrated—and Commerce has found—that KEPCO's revenue on sales of electricity is sufficient to cover costs (including the cost of generation) *and a return on investment* for each tariff classification. *See Preliminary IDM* at 31 (P.R.179). POSCO was subject to the same electricity rates as the other companies in its respective classifications. *Final IDM* at 22 (P.R.227). To the extent that POSCO paid less for electricity during particular times of the day than during other periods, this court has rejected such pricing as evidence of cross-subsidization, explaining that "it would seem that setting lower rates for lower demand during

off-peak hours is consistent with market principles rather than being a hallmark of 'de facto cross-subsidization.'" *POSCO*, 581 F. Supp. 3d at 1281. Moreover, Plaintiff's theory that KEPCO sells at a loss to "large industrial users" while recouping those losses through sales to other customers is contradicted by the fact that KEPCO's **[**

**]**. GOK NSA QR at 20 (C.R.229/P.R.115), Exhibit E-10 (C.R.232/P.R.115), E-18 (C.R.232); GOK 2nd SQR at Exhibit E-18.2 (C.R.312-314/P.R.170).

Thus, notwithstanding Plaintiff's assertions to the contrary, record evidence demonstrates that the prices charged by KEPCO were above its reported costs of supply for the tariff classes and were sufficient to cover costs (including the cost of electricity generation) plus the return on investment. Therefore, substantial evidence supports Commerce's conclusion, and Plaintiff's arguments are without merit.

## **CONCLUSION**

For the reasons discussed above, the challenged aspects of Commerce's *Final Results* are supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
Dated: November 21, 2022        *Counsel for the Government of the Republic of Korea*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certify that the forgoing Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record, dated November 21, 2022, complies with the word-count limitation set forth in the Court's June 8, 2022 Scheduling Order.  The memorandum of law contains 6,801 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Sarah S. Sprinkle
Daniel M. Witkowski
Devin S. Sikes
Sydney L. Stringer
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: November 21, 2022          *Counsel for the Government of the Republic of Korea*

1