NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| NUCOR CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>    and,<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>               Defendant-Intervenor. |

Before: Hon. Mark A. Barnett,
        Chief Judge

Court No. 22-00070

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 15, and 17-19

<u>**PLAINTIFF NUCOR CORPORATION'S REPLY BREIF**</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

**Dated: December 19, 2022**

NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

                                                                                    **Page**

I.      INTRODUCTION .............................................................................................. 1

II.     ARGUMENT ..................................................................................................... 1

        A.      The Federal Circuit Has Not Endorsed Commerce's Unlawful
                Analysis ................................................................................................ 1

        B.      Commerce's Determination That The Government Price Was
                Consistent With Market Principles Was Unlawful ............................... 4

                1.      Commerce Unlawfully Ignored The Government Price To
                        The Respondents In Determining Whether A Benefit Exists ..................... 4

                2.      The Tier Three Rule Does Not Free Commerce From The
                        Requirements Of The Adequate Remuneration Standard ........................... 7

                3.      The Final Results Do Not Reflect A Necessary Or Well-
                        Established Tier Three Methodology ........................................................ 10

        C.      The Final Results Were Unsupported By Substantial Evidence ........................ 15

III.    CONCLUSION ................................................................................................ 20

Ct. No. 22-00070                                    NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962)..................................................................................16

*ClearCorrect Operating, LLC v. U.S. Int'l Trade Comm'n*,
    810 F.3d 1283 (Fed. Cir. 2015)....................................................................8

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)....................................................................................15

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)........................................................................8, 10, 14

*Nucor Corp. v. United States*,
    927 F.3d 1243 (Fed. Cir. 2019)............................................................ *passim*

*POSCO v. United States*,
    977 F.3d 1369 (Fed. Cir. 2020).................................................................1, 3

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)....................................................................9

*Sorenson v. Sec'y of Treasury of U.S.*,
    475 U.S. 851 (1986)......................................................................................9

*U.S. Steel Corp. v. United States*,
    33 CIT 1935 (2009)......................................................................................8

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)......................................................................................8

**Statutes**

19 U.S.C. § 1677(5)(E) ..........................................................................4, 7, 10

19 U.S.C. § 1677(5A) .....................................................................................6

19 U.S.C. § 1677f-1(e)................................................................................4, 10

**Regulations**

19 C.F.R. § 351.503(b) ...................................................................................9

Ct. No. 22-00070                                    NON-CONFIDENTIAL VERSION

19 C.F.R. § 351.503(b)(1) ...................................................................................5

19 C.F.R. § 351.511(a)(2)(i) ..............................................................................5

19 C.F.R. § 351.511(a)(2)(ii) .............................................................................5

19 C.F.R. § 351.511(a)(2)(iii) ..........................................................................5, 9

19 C.F.R. § 351.511(b) .....................................................................................10

**Administrative Materials**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017)............................................16

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*,
81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ....................................12, 14

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) .................................2

*Certain Softwood Lumber Products from Canada*,
66 Fed. Reg. 43,186 (Dep't Commerce Aug. 17, 2001)...................................4, 7, 9

*Certain Softwood Lumber Products from Canada*,
82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017)....................................19, 20

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*,
73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ...........................................8

*Coated Free Sheet Paper from Indonesia*,
72 Fed. Reg. 17,498 (Dep't Commerce Apr. 9, 2007)..........................................13

*Supercalendered Paper from Canada*,
80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) ........................................14

## I.   <u>INTRODUCTION</u>

On behalf of Nucor Corporation ("Nucor"), we hereby submit the following brief in reply to the response briefs of Defendant the United States and Defendant-Intervenor the Government of Korea ("GOK"). Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R. (Oct. 31, 2022), ECF No. 32 ("Def. Resp. Br."); Def.-Int. Gov't of the Republic of Korea's Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. (Nov. 21, 2022), ECF No. 33 ("GOK Resp. Br."). Nucor respectfully requests that the Court find the arguments of Defendant and Defendant-Intervenor unpersuasive and hold that the U.S. Department of Commerce's ("Commerce") final results of the 2019 administrative review of *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea* were unsupported by substantial evidence and otherwise not in accordance with law. *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022) (final results and partial recission of countervailing duty admin. rev.; 2019), P.R. 231 ("Final Results").

## II.   <u>ARGUMENT</u>

### A.   <u>The Federal Circuit Has Not Endorsed Commerce's Unlawful Analysis</u>

Defendant and Defendant-Intervenor mischaracterize the U.S. Court of Appeals for the Federal Circuit's holdings in *Nucor* and *POSCO*. *Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019); *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020). Defendant asserts that "the Federal Circuit upheld {the agency's} approach in *Nucor v. United States*" and "did not question it in *POSCO v. United States* . . . other than to require Commerce to examine both KEPCO and KPX, which Commerce did here." Def. Resp. Br. at 19. Defendant-Intervenor makes similar assertions. GOK Resp. Br. at 11.

While the Federal Circuit's holdings in *Nucor* and *POSCO* are applicable with respect to the interpretation of "adequate remuneration" in the statute and thus the meaning of the agency's adequate remuneration rule, neither case squarely addressed the questions before the Court in this case. The *Nucor* and *POSCO* opinions certainly did not "affirm" anything that Commerce did in the Final Results.

Contrary to Defendant's assertion, the analysis that Commerce applied in the Final Results is not the same analysis that it applied in the original investigations under review in *Nucor* and *POSCO*. Def. Resp. Br. at 20 (suggesting that the Federal Circuit's holding in *Nucor* was "based on a nearly identical process to the one that Commerce used here"). In those cases, Commerce applied a "standard pricing mechanism" analysis, under which, "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity, then there is no benefit." Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) (final affirm. deter., and final affirm. critical circumstances deter., in part) at 18. Commerce asserted this preferentiality analysis alone was "sufficient to support a finding that no benefit is conferred." *Id.* at 20. *See also id.* at 21. The Federal Circuit in *Nucor* held that Commerce's position that an analysis of preferential rates was sufficient to support a finding of adequate remuneration was "beyond any reasonable interpretation of the statute, or of its implementing regulation." *Nucor*, 927 F.3d at 1249.

Regarding Commerce's purported cost recovery finding in the original investigation, Nucor argued that Commerce erred by limiting its analysis of KEPCO's costs to KEPCO's cost of purchasing electricity through the Korea Power Exchange ("KPX") – *i.e.*, that Commerce could

not simply presume that the value of KEPCO's reported costs reflected a market-based value that could be used in a cost recovery determination. *See id.* at 1255-56. The *Nucor* majority declined to consider this argument on exhaustion grounds. *Id. But see id.* at 1258-62 (Reyna, J., dissenting). No such exhaustion defense was raised in *POSCO*, where the court incorporated the *Nucor* court's holdings regarding the preferential rates standard and remanded Commerce's analysis of KEPCO's costs for failing to thoroughly account for the role of the KPX and the costs of electricity generation and supply. *POSCO*, 977 F.3d at 1375-78. Review of Commerce's remand redeterminations pursuant to *POSCO* remains pending before the Federal Circuit.

Commerce articulated a different methodology in the Final Results at issue here. Instead of applying the "standard pricing mechanism" framework, it considered whether the government price is consistent with market principles because it "cover{s} both cost recovery and a rate of return." Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022), P.R. 227, at 23 ("Final Decision Memo"). Unlike in *Nucor* and *POSCO*, where Commerce analyzed government prices for qualitative consistency with a "standard pricing mechanism," the Final Results sought to apply a quantitative comparison between two numbers – a "cost-plus-profit" value and a "government price." Even if Commerce's analysis here is more "consistent with its approach" in the *POSCO* remand, Def. Resp. Br. at 21, the Federal Circuit has not sustained that remand redetermination.

Here, Nucor continues to challenge Commerce's conclusions regarding the value of KEPCO's reported *costs*, which the Federal Circuit in *POSCO* remanded as unlawful and unsupported by substantial evidence. *See* Pl. Nucor Corp.'s Rule 56.2 Mot. for J. on the Agency R. (Aug. 17, 2022), ECF No. 34 at 21-22 ("Nucor Br."); Letter from Wiley Rein LLP to Sec'y

Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Case Brief* (Dec. 15, 2021), C.R. 360, P.R. 221, at 4-5 ("Nucor Case Br."). Nucor also challenges the *price* side of Commerce's analysis. Nucor Br. at 12-18; Nucor Case Br. at 4-12. This additional argument is that Commerce may not determine whether the government *price* represents a market-based, cost-plus-profit price based on the government supplier's aggregate financial performance or its total unit sales revenues on all sales to all customers. Instead, the determination must be based on the government *price to the respondent*. The Federal Circuit has not addressed this issue.

**B.** **Commerce's Determination that the Government Price Was Consistent with Market Principles Was Unlawful**

**1.** **Commerce Unlawfully Ignored the Government Price to the Respondents in Determining Whether a Benefit Exists**

Commerce's determination that KEPCO's prices were consistent with market principles because total unit revenues on all sales in a particular tariff classification covered KEPCO's reported cost of supply was unlawful. The statute requires Commerce to determine "individual countervailable subsidy rate{s}," 19 U.S.C. § 1677f-1(e), and to find that a benefit is conferred "where there is a benefit *to the recipient*," *id.* § 1677(5)(E) (emphasis added). This determination should be made with "reference to what *the recipient* would have had to pay for the . . . good . . . in the marketplace, absent any government involvement." *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,193 (Dep't Commerce Aug. 17, 2001) (notice of prelim. affirm. countervailing duty deter., prelim. affirm. critical circumstances deter., and alignment of final countervailing duty deter. with final antidumping duty deter.) ("*Softwood Lumber from Canada*") (emphasis added). This is different from basing the benefit analysis on whether there is a cost to the government in bestowing the subsidy. The latter "is wholly inappropriate from the

perspective of the *private recipient*." *Id.* (emphasis added).  The statute and Commerce's practice thus focus the analysis on the benefit of a government financial contribution to the individual exporters or producers under investigation or review.

Commerce's regulations do the same.  The general rule regarding the benefit conferred by subsidies is that Commerce "normally will consider a benefit to be conferred where *a firm pays less for its inputs . . . than it otherwise would pay . . . .*"  19 C.F.R. § 351.503(b)(1) (emphasis added).  Each "tier" of Commerce's "adequate remuneration" rule refers to "the government price," *id.* § 351.511(a)(2)(i)-(iii), and neither Defendant nor Defendant-Intervenors have disputed that "the government price" refers to the government price actually paid by the respondents under tiers one and two.  Here, Commerce unlawfully determined whether a benefit exists based on KEPCO's total unit revenues on all sales to all consumers under an electricity tariff classification, without regard to the government prices actually paid by the respondents.  Nucor Br. at 14-18.

Both Defendant's and Defendant-Intervenor's responses to Nucor's arguments are unpersuasive.  Defendant accuses Nucor of quoting the rule that Commerce articulated in the *POSCO* remand results out of context.  Def. Resp. Br. at 20-21.  Defendant does not, however, explain how the additional "context" that it provides changes the meaning of the rule as Nucor quoted it.  Nucor quoted the rule as follows: "If the tariff charged to *the respondent* does not cover 'cost of production' plus a 'profitable return on the investment' . . . then *the respondent* has received a countervailable benefit under section 771(5)(E) of the Act."  Nucor Br. at 3, 12.  This is a clear "if-then" proposition that is not qualified by any of the surrounding language that Defendant includes.  Def. Resp. Br. at 21.

Per Defendant's own description of Commerce's analysis, the agency did not apply this standard in the Final Results.  If anything, Commerce only "evaluat{ed} the electricity prices to

see if they *allow for* the recovery of costs, plus a rate of recovery or profit." *Id.* at 18 (emphasis

added). *See also* GOK Resp. Br. at 8 (asserting that "Commerce assessed whether the government

price was consistent with market principles by determining whether the electricity prices charged

by KEPCO *allow for* the recovery of costs, plus a rate of return"). The question as articulated by

Commerce itself, however, is not whether KEPCO's broader pricing methodology "allows" or

"permits" it to recover costs as a conceptual matter. It is whether, as an empirical matter, the prices

actually charged to the respondents cover the government supplier's cost of production and supply

plus an amount for profit. As Nucor demonstrated in its opening brief, in this case they did not.

Nucor Br. at 22-24. Commerce's conclusion to the contrary was not in fact based on KEPCO's

*prices* at all. *Id.* at 16.

      Neither Defendant nor Defendant-Intervenor squarely addresses the fact that Commerce's

determination was not based on "the government price," as the regulation requires, but on

KEPCO's total annual unit revenues on all sales to all customers under the relevant tariff

classification. *Id.* at 15-16. Instead, Defendant and Defendant-Intervenor suggest that basing the

determination on KEPCO's total unit revenue *was* an analysis of KEPCO's "prices" because the

respondents "paid electricity prices that are charged to all companies in the corresponding

electricity consumption classifications . . . ." Def. Resp. Br. at 24. *See also* GOK Resp. Br. at 11.

      It is undisputed that the respondents paid for electricity based on prices in KEPCO's tariff

schedule, but this is a red herring.[1] Commerce did not consider whether any *prices*, either those

---

[1]     The GOK also suggests that this issue turns on whether Commerce may or may not have
determined that the provision of electricity for less than adequate remuneration ("LTAR") is
respondent-specific. GOK Resp. Br. at 11. But Commerce did not reach the issue of specificity,
so that question is not before the Court. It is unclear how Nucor's argument turns on whether
Commerce would have found the provision of electricity for LTAR to be respondent-specific or
specific for one of the many other reasons enumerated in the statute. 19 U.S.C. § 1677(5A).

listed in KEPCO's tariff schedule or those reported in respondents' questionnaire responses, covered KEPCO's cost of production plus an amount for profit. *See* Nucor Br. at 16. It considered only KEPCO's total unit sales *revenues* from all sales to all customers under the respective tariff classifications. This value did not resemble either the prices listed in KEPCO's tariff schedule, or the prices that POSCO reported actually paying. *Id.* At most, Commerce's analysis shows only that there was no cost to KEPCO in structuring its electricity prices the way that it did, but this analysis is "wholly inappropriate from the perspective of the private recipient." *Softwood Lumber from Canada* at 43,139. It says nothing about whether there was a "benefit to the recipient," as the statute requires. 19 U.S.C. § 1677(5)(E). Neither Defendant nor Defendant-Intervenor address Commerce's reliance on an unlawful "cost to the government" standard.

### 2.   The Tier Three Rule Does Not Free Commerce from the Requirements of the Adequate Remuneration Standard

Defendant and Defendant-Intervenor attempt to distinguish the authorities that Nucor cited, or to characterize them as inapplicable to a tier-three adequate remuneration analysis. Def. Resp. Br. at 22-24; GOK Resp. Br. at 9-11. The GOK argues that the statutory and regulatory provisions that focus Commerce's subsidy investigations on the benefit to the respondents under consideration do not address how Commerce is to conduct an adequate remuneration analysis under the tier three regulation. GOK Resp. Br. at 9-10. Defendant and Defendant-Intervenor both suggest that the agency and court decisions cited by Nucor are inapplicable to the extent that they involve determinations under tier one or tier two of the agency's adequate remuneration rule. Def. Resp. Br. at 22-23; GOK Resp. Br. at 10-11. These arguments should be rejected because the tier three rule does not exist in a vacuum. Whatever "range of potential implementation choices" Commerce may have, Def. Resp. Br. at 10; GOK Resp. Br. at 7-8, its application of the rules "must

fall within the bounds of reasonable interpretation," and "{t}hat is a requirement an agency can fail." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).

First, Commerce's applications of the tier three rule are bound by the requirements of the statutory adequate remuneration standard. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014) ("Agencies exercise discretion only in the interstices created by statutory silence or ambiguity . . . ."). As the Federal Circuit explained in *Nucor*, the tier three rule is part and parcel of what must be read as a coherent regulatory framework to apply *the same* statutory standard. *See Nucor*, 927 F.3d at 1253 ("The above-stated meaning of 'market principles' sensibly treats the three {regulatory} methods as *all of a piece*, because the two primary methods of implementing the statutory standard rely on competitive-market prices, which . . . are tied to 'fair value.'") (emphasis added). As a result, if the broader financial performance of the government supplier "does not demonstrate that its prices . . . are *market-based*," *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) (emphasis added), and if it is otherwise "not relevant to the determination of whether {an input} was sold for {*adequate remuneration*}," Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) (final affirm. countervailing duty deter. and final affirm. deter. of critical circumstances) at 65 (emphasis added), then that must be true for all three tiers of Commerce's rule.

Commerce must also apply the regulation in accordance with its plain terms. *See Kisor*, 139 S. Ct. at 2415 (explaining that courts should not defer to an agency's interpretation of its rules "unless the regulation is genuinely ambiguous" after "exhausting all the 'traditional tools' of construction"); *ClearCorrect Operating, LLC v. U.S. Int'l Trade Comm'n*, 810 F.3d 1283, 1290 (Fed. Cir. 2015) ("If the . . . language is plain, we must enforce it according to its terms. . . .

{W}hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.").  Here, the regulation is unambiguous. Commerce's tier three rule may not lay out an explicit methodology, but it is quite clear with respect to *what* must be "consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  That is the "government price," and not the government supplier's revenues on all sales to all customers. *Id.*

It is also clear from the immediate context of the tier three rule that "the government price" means the government price *to the respondent*.  Again, neither Defendant nor Defendant-Intervenors seem to dispute that "the government price" under the tier one and tier two rules refers to the government price actually paid the respondent.  Because "identical words used in different parts of the same act are intended to have the same meaning," the tier three rule's reference to "the government price" must also mean the government price to the respondent.  *See, e.g.*, *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986).  "This is particularly so because the {three} provisions are directed to the same calculation . . . ."  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

The tier three rule's place within the broader statutory and regulatory scheme confirms this meaning of "the government price."  First, the general "benefit" rule is that Commerce "normally will consider a benefit to be conferred where *a firm pays* less for its inputs . . . than it otherwise would pay in the absence of the government program," 19 C.F.R. § 351.503(b), not where *a government supplier earns* less than it otherwise would on its aggregate sales to all purchasers. This general rule tracks Commerce's interpretation of "adequate remuneration" elsewhere.  *See, e.g.*, *Softwood Lumber from Canada* at 43,193 ("{T}he true measure of the benefit derived from any government largesse is by reference to what *the recipient* would have had to pay for the

physical or financial good or service in the marketplace, absent any government involvement.")

(emphasis added).  The adequate remuneration rule itself provides that Commerce "normally will

consider a benefit as having been received as of the date on which *the firm pays* . . . for the

government-provided good or service," 19 C.F.R. § 351.511(b) (emphasis added).  The statute, in

turn, directs Commerce to determine whether there is a "benefit to *the recipient*," and to determine

"*individual* countervailable subsidy rates."  19 U.S.C §§ 1677(5)(E), 1677f-1(e) (emphasis added).

These provisions are necessary context for Commerce's rule that allows the Court to "perform

{its} reviewing and restraining {function}" with respect to Commerce's determination.  *Kisor*,

139 S. Ct. at 2415.

### 3.    The Final Results Do Not Reflect a Necessary or Well-Established Tier Three Methodology

Notwithstanding the clear requirements of the agency's rule in the context of the statute

and regulations, Defendant suggests that it was not only reasonable, but necessary for Commerce

to rely on an analysis of the government supplier's overall revenues.  Defendant posits that "{i}t

is unclear how Commerce could determine that the 'the government price is consistent with market

principles' *without* examining 'the aggregate performance of the government supplier.'"  Def.

Resp. Br. at 23.  According to Defendant, in a tier three analysis, "Commerce is necessarily without

the benefit of 'market-determined' or 'world market' prices to which it can compare the prices

paid 'by the respondent.'"  *Id.*  This ignores both Commerce's findings in Final Results, and the

agency's practice in other tier three cases.

Here, Commerce first determined that its "prior evaluation of KPX's electricity prices and

record information demonstrate that there is a pricing mechanism in place for KEPCO to acquire

electricity that does not confer a benefit" because it "reflect{s} the costs of electricity generation

and supply and should continue to be the basis of our analysis." *Id.* at 16.  *See also* Preliminary Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 86 Fed. Reg. 42,788 (Dep't Commerce Aug. 5, 2021) (prelim. results of countervailing duty admin. rev., and intent to rescind rev, in part; 2019), P.R. 179, at 31-32 ("Prelim. Decision Memo") (determining that KEPCO's cost of acquisition through the KPX was based on a cost-plus-profit value that represents the market value of electricity).  Contrary to the premise of Defendant's argument, then, Commerce *did* have a benchmark that it determined was consistent with market principles.

Having determined that KEPCO's reported cost of supply represented a cost-plus-profit price that was consistent with market principles, however, Commerce did not compare this benchmark to the prices actually paid by the respondent, as Nucor argued that it should in the absence of other information.  Nucor Case Br. at 4-8.  Instead, to determine whether a benefit exists, Commerce compared KEPCO's reported cost of supply by tariff classification to KEPCO's total unit revenues by tariff classification, with no reference whatsoever to the prices in KEPCO's tariff schedule or to the prices that the respondent reported paying.  Prelim. Decision Memo at 31-32; Memorandum from Faris Montgomery, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII, through Irene Gorelik, Acting Program Manager, AD/CVD Operations, Off. VIII, to The File, re: *Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results Calculation Memorandum for POSCO* (July 30, 2021), C.R. 323-324, P.R. 180-181, at 9 ("Prelim. Calc. Memo") (unchanged in final).

The issue is thus not the existence or the availability of benchmarks in this or other tier three cases, as Defendant suggests.  The issue is Commerce's failure to use the cost-plus-profit

benchmark that it identified to evaluate the benefit conferred by "the government price" paid by the respondent. In numerous tier-three cases, including one cited by Defendant, Commerce has identified benchmark prices, including benchmark prices derived from third-country data, and it has compared those benchmark prices to the government price charged to the respondent to determine whether and to what extent there was a benefit. Nucor Br. at 13-14; Def. Resp. Br. at 16 (citing *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021).

The GOK argues that these tier three cases are inapplicable because Commerce only compared the respondents' prices to a benchmark after determining that the government's prices were not consistent with market principles. GOK Resp. Br. at 10. This may be true, but that purported distinction reflects only Commerce's inconsistent methodologies to determine whether a government price is consistent with market principles. It does not change the fact that Commerce has consistently determined whether and to what extent there was a benefit based on a comparison between a benchmark price and the prices actually paid by the respondents.

In *Cold-Rolled from Russia*, Commerce explained that "the regulations do not prescribe any particular analysis under {tier three}," such that methodologies "must be developed on a case-by-case basis." Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirm. countervailing duty deter. and final neg. critical circumstances deter.) at 67 ("*Cold-Rolled from Russia* IDM"). It determined whether the government supplier's prices were consistent with market principles based on a qualitative assessment of government intervention drawn largely from narrative explanations in the government supplier's annual reports, not based on whether the government prices covered costs plus an amount for profit. *Id.* at 67-69. Commerce

in fact declined the respondents' and foreign government's suggestion to consider "whether {the} regulated prices allow the system to recover full economic costs to sustain continuing operations" and whether there was "a price regulating philosophy that accounts for cost recovery, investment, and profit." *Id.* at 64, 66-67.

Having determined based on its qualitative assessment that the government supplier's prices were not consistent with market principles, Commerce then determined whether those prices conferred a benefit to the recipient by comparing an external benchmark price to the prices actually paid by the respondents. *Id.* at 18-19. Commerce conducted a similar qualitative assessment in *Coated Free Sheet Paper from Indonesia*, before determining whether there was a benefit to the recipient by comparing a benchmark price to the price actually paid by the respondents. *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 17,498, 17,503-04 (Dep't Commerce Apr. 9, 2007) (notice of prelim. affirm. countervailing duty deter.) (unchanged in final).

Here, Commerce did not determine whether KEPCO's prices were consistent with market principles using a qualitative assessment of GOK intervention in the electricity market or in KEPCO's price-setting process. In fact, Commerce made effectively no reference whatsoever to the GOK's interventions in the market or its control over all aspects of the "price-setting mechanism." Final Decision Memo at 15-19. Instead, it articulated a purely quantitative standard, similar to the one it rejected in *Cold-Rolled from Russia*, that a government price is consistent with market principles to the extent that it covers the government supplier's cost of supply plus an amount for profit.

This standard more closely resembles Commerce's methodology in *Supercalendered Paper from Canada*. But in that case, the agency clearly determined that *the price actually paid by the respondent* was not consistent with market principles because *the price actually paid by the*

*respondent* did not cover the government supplier's costs plus an amount for profit.  Issues and

Decision Memorandum accompanying *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535

(Dep't Commerce Oct. 20, 2015) (final affirm. countervailing duty deter.) at 48 ("Accordingly, we

determine that the 'below-the-line' *Port Hawkesbury {rate}* was not set by a market-determined

method" because "'below-the-line' rates do not include rates of return sufficient to ensure future

operations by covering all costs and providing for profit.").  It did not, as it did here, determine

that the government supplier's prices were consistent with market principles *because the*

*government supplier's total revenues* on some broader amalgamation of sales covered costs plus

profit.

      Each of these cases demonstrates that, under tier three as under tiers one and two,

Commerce determines whether a benefit was conferred to the respondent (*i.e.*, whether there was

a benefit to the recipient), based on the prices actually paid by the respondent.  Beyond that,

Commerce has no "well-established" methodology for determining whether a government price is

"consistent with market principles" under tier three, as Commerce has asserted.  Final Decision

Memo at 21 ("We find that it is appropriate to continue to rely on our well-established tier-three

methodology to analyze this program."); Def. Resp. Br. at 18 (claiming that Commerce applied an

"established tier 3 benchmark approach").  *But see, e.g.*, *Cold-Rolled from Russia* IDM at 67

("{T}he regulations do not prescribe any particular analysis under this prong.  Rather . . . the

analysis . . . must be developed on a case-by-case basis.").

      Counsel for Nucor is unaware of any cases in which Commerce has applied the

methodology at issue here in contexts other than its analysis of electricity for LTAR in Korea.

Neither Defendant nor Defendant-Intervenor point to any either.  This counsels against deferring

to the agency's interpretation of the rule.  *See, e.g.*, *Kisor*, 139 S. Ct. at 2417-18 (requiring that "an

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

agency's reading of a rule must reflect 'fair and considered judgment,'" such that "{w}e have . . . only rarely given *Auer* deference to an agency construction conflicting with a prior one"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years.").

### C.     The Final Results Were Unsupported by Substantial Evidence

In its Opening Brief, Nucor argued that the Final Results were unsupported by substantial evidence for two reasons.   First, Commerce's conclusion that KEPCO's cost of acquiring electricity through the KPX was a market-based, cost-plus-profit price reflecting the fair value of electricity was unsubstantiated given the agency's failure to obtain actual cost data from the generators themselves or otherwise confirm the accuracy of the KPX's cost assignments.   Nucor Br. at 18-22.   Nucor pointed out that each element of the price at which KEPCO acquires electricity through the KPX is established by a GOK-controlled "Cost-Evaluation Committee" within the KPX and thus should not be accepted without confirmation that they reflect the actual costs of generation and supply.   *Id.* at 21-22.   Second, Nucor showed that, even based on KEPCO's costs as reported, any conclusion that the prices paid by the respondents were cost-plus-profit prices was undermined by record evidence confirming that those prices were [

].   *Id.* at 22-24.

According to Defendant, Nucor's arguments are based on "two stand-alone record documents," neither of which "establish that the GOK's prices were not in line with market principles or otherwise did not accurately reflect the costs of electricity generation and supply." Def. Resp. Br. at 16-17.   But that is precisely what these purportedly "stand-alone documents" establish.   First, the Korean National Assembly, for the second time in ten years, determined that

KEPCO was providing subsidized electricity to large industrial users, with steel producers like POSCO among the primary beneficiaries.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to Length Plate from the Republic of Korea: Comments and Rebuttal Factual Information on New Subsidy Allegation Questionnaire Responses* (May 11, 2021), C.R. 256-265, P.R. 129-138, at Exhibit 5 ("Nucor May 11 Comments").  *See also* Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) (final affirm. countervailing duty deter. and final neg. critical circumstances deter.) at 33 (discussing a similar Korean National Assembly Report issued in 2012).  Second, a GOK-affiliated research institute determined that KEPCO's electricity prices were at least 15-30 percent below the cost of base-load generators during off-peak hours, when large industrial users like POSCO consume most of their electricity.  *See* Nucor May 11 Comments at Exhibit 5, Exhibit 6.  While these reports are related to KEPCO's prices generally and do not, as Defendant asserts, "focus . . . on the prices paid by POSCO compared to KEPCO's costs," Def. Resp. Br. at 17, they do corroborate the results of such a comparison, which, as discussed above, is supposed to be the focus of Commerce's LTAR analysis pursuant to statute, regulation, and agency practice.  *See* Nucor Br. at 22.

For its part, the GOK presents several arguments that were not articulated in Commerce's Final Results and thus constitute post-hoc rationalization that the Court should not consider.  *See, e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("{C}ourts may not accept appellate counsel's post hoc rationalizations for agency action.").  Nor does Defendant advance them here.  They are unpersuasive regardless.

The GOK first accuses Nucor of "cherry-picking" data and takes issue with comparing KEPCO's reported costs to the monthly, period-specific, time-of-use prices that the respondents

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

reported paying.  GOK Resp. Br. at 18-21.  Nucor's arguments were based on a comparison between KEPCO's cost of supply, *as reported by the GOK*, and POSCO's prices, as reported by POSCO.  Nucor Br. at 22.  The GOK does not identify which alternative sources of data it believes that Nucor should have used.  The GOK also suggests that Nucor "selectively identifies POSCO's [                ]," GOK Resp. Br. at 19.  It does not, however, explain why this matters.  Nucor used the [                ] as a representative example of the prices paid by POSCO's steelmaking facilities, [                                                    ].  Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Electricity New Subsidy Allegation Questionnaire Response* (Apr. 27, 2021), C.R. 235-244, P.R. 117, at 3, Exhibit NSA-2.1 ("POSCO NSA QR").

The GOK also suggests that comparing KEPCO's reported cost of supply to POSCO's prices as reported "fails to take into account the prevailing market condition in the Korean electricity market."  GOK Resp. Br. at 20.  This purported "prevailing market condition," according to the GOK, is that "the relationship between supply and demand is heavily affected by the time of day," and "{w}hen demand is low, KEPCO sources electricity for distribution from the lowest-cost generators (e.g., nuclear or coal), thereby meriting a lower price to the downstream customers . . . ."  *Id.*  The GOK has repeatedly characterized the Korean electricity market in this manner, but it has never provided *any* data to support it.  Nor has Commerce asked it to so, notwithstanding Nucor's comments.  *See, e.g.*, Nucor May 11 Comments at 11; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from The Republic of Korea: Additional Comments on the Government of Korea's New Subsidy Allegation Questionnaire Response* (May 21, 2021), C.R. 274, P.R. 144, at 5-6.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

The only relevant information on the record directly undermines the GOK's characterization. According to the Korean National Assembly report noted above, for example, "demand for electricity during light load times exceeds the base generation amount due to excessive rate discount{s} . . . . It is possible to meet the demand during light load periods only by turning generators . . . which have high power generation costs." Nucor May 11 Comments at Exhibit 5. The Korean Energy Institute's conclusions, also noted above, were the same. Because of subsidized prices, "the transfer of demand from the maximum load period to the light load period is excessive, and the load in the light load period exceeds the facility capacity of the base power source . . . ." *Id.* at Exhibit 6. KEPCO's Form 20-F for the POR likewise shows that [

] was at off-peak prices that were [

] in 2019. *See* Letter from Lee & Ko LLC to Sec'y Commerce, re: *Administrative Review of the Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Response to New Subsidy Allegation Questionnaire* (Apr. 27, 2021), C.R. 229-234, P.R. 115, at Exhibit E-2, p. 39 (showing that the lowest-cost generator sold electricity through the KPX at an average price of KRW 60.22 per kWh); POSCO NSA QR at Exhibit NSA-2.1 (showing that POSCO's steelmaking facilities purchased approximately [    ] percent of their electricity at an annual average off-peak price of [                      ].[2] Thus,

---

[2]    In reviewing the *POSCO* remand results, the court faulted Nucor for purportedly comparing an annual average unit value to monthly average unit values. *See* GOK Resp. Br. at 19. The comparison here is between two annual unit values and is corroborated by multiple sources of data, including the data reported by the GOK itself. There is thus no basis here for accusing Nucor of "cherry picking" anything.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED    **NON-CONFIDENTIAL VERSION**

even assuming that KEPCO's lowest cost generator supplied 100 percent of electricity during off-peak hours, which it did not, a benefit was still conferred.

In other words, outside the context of this litigation, the Korean government itself has said repeatedly that KEPCO sells electricity to large industrial users, including to the steel industry and POSCO in particular, at prices that are far below cost and thus subsidized pursuant to the rule that Commerce has articulated.  The only actual data on the record confirms this assessment.

Finally, to the extent that the GOK has problems with comparing the annual unit cost of supply that it reported to the period-specific prices that POSCO reported (and that are listed in KEPCO's tariff schedule), GOK Resp. Br. at 19-20, then its problem is with Commerce and with its own reporting, and not with Nucor.   In the Final Results, Commerce based its benefit calculations for those tariff classifications where it found a benefit was conferred on the monthly, period-specific prices as reported by POSCO.   *See* Prelim. Calc. Memo at Attachment II ([                              ] tab).  Neither the GOK nor POSCO challenged this methodology below.

The methodology is consistent with Commerce's practice in calculating the benefit conferred by LTAR subsidies.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (final affirm. countervailing duty deter., and final neg. deter. of critical circumstances) at 41, 66. ("*Softwood Lumber* IDM") (explaining that Commerce conducts the benchmark comparison "on the basis that is as close to a transaction-specific analysis as possible given the available record evidence," and that it does not determine an "overall benefit derived from all government sales of the good" because "a benefit is either conferred or not conferred; there is no such thing as a 'negative' benefit under the Act").  Given that the GOK reported only a single, annual value for

NON-CONFIDENTIAL VERSION

KEPCO's cost of supply, "that is as close to a transaction-specific analysis as possible given the available record evidence." *Softwood Lumber* IDM at 41 n.248, 66. If the GOK had believed that Commerce should have used KEPCO's monthly, period-specific costs, then it should have provided that data.

## III.   <u>CONCLUSION</u>

For the reasons discussed above and in Nucor's Opening Brief, Nucor respectfully requests that the Court hold that Commerce's Final Results were unsupported by substantial evidence and otherwise not in accordance with law, and remand to Commerce for redetermination in accordance with the Court's opinion.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff Nucor Corporation*

Dated: December 19, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,126 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

December 19, 2022
(Date)