Slip Op. 23-64

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NUCOR CORPORATION, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Court No. 22-00070 |
| and | |
| GOVERNMENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenor. | |

**<u>OPINION</u>**

[Sustaining the U.S. Department of Commerce's final results in the 2019 administrative review of the countervailing duty order on certain carbon and alloy steel cut-to-length plate from the Republic of Korea.]

Dated: April 28, 2023

Adam M. Teslik, Wiley Rein LLP, of Washington, DC, argued for Plaintiff Nucor Corporation.  With him on the brief were Alan H. Price, Christopher B. Weld, and Tessa V. Capeloto.

Augustus Golden, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director.  Of Counsel on the brief was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Sarah S. Sprinkle, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for Defendant-Intervenor Government of the Republic of Korea.  With her on the brief were Yujin K. McNamara, Daniel M. Witkowski, Devin S. Sikes, Sung Un K. Kim, and Sydney L. Stringer.

Barnett, Chief Judge: Plaintiff Nucor Corporation ("Nucor") challenges the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the 2019 administrative review of the countervailing duty ("CVD") order on certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Republic of Korea ("Korea"). Compl., ECF No. 8; *see also Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 87 Fed. Reg. 6,842 (Dep't Commerce Feb. 7, 2022) (final results and partial rescission of [CVD] admin. review, 2019) ("*Final Results*"), ECF No. 19-4, and accompanying Issues and Decision Mem., C-580-888 (Jan. 31, 2022) ("I&D Mem."), ECF No. 19-5.[1]  Nucor seeks judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2 and requests the court to remand Commerce's determination that the Government of the Republic of Korea ("Government of Korea" or "GOK") does not provide a countervailable subsidy to the Korean steel industry through the provision of electricity for less than adequate remuneration.  *See* Confid. Pl. Nucor Corp.'s Rule 56.2 Mot. for J. on the Agency R. and accompanying Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 30; Confid. Pl. Nucor Corp.'s Reply Br. ("Pl.'s Reply"), ECF No. 35.

---

[1] The administrative record for the *Final Results* is contained in a Public Administrative Record ("PR"), ECF No. 19-1, and a Confidential Administrative Record ("CR"), ECF No. 19-2.  Nucor submitted joint appendices containing record documents cited in Parties' briefs and requested by the court. *See* Confid. J.A. ("CJA"), ECF Nos. 37 (Tab 1–Tab 10 (Part 1)), 37-1 (Tab 10 (Part 2)), 37-2 (Tab 10 (Part 3)–Tab 17); Public J.A., ECF No. 38; First Suppl. Confid. J.A. ("1st Suppl. CJA"), ECF Nos. 44–44-4 (replacing Tabs 4 and 5 previously filed), First Suppl. Public J.A., ECF Nos. 45, 45-1; Second Suppl. Confid. J.A. ("2nd Suppl. CJA"), ECF No. 47 ; 2nd Suppl. Public J.A., ECF No. 48.  The court references the confidential record documents unless otherwise specified.

Defendant United States ("the Government") and Defendant-Intervenor the Government of Korea urge the court to sustain the *Final Results*.  Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. ("Def.'s Resp."), ECF No. 32; Confid. Def.-Int. [Gov't of Korea's] Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def-Int.'s Resp."), ECF No. 33.

For the following reasons, the court sustains the *Final Results*.

BACKGROUND

## I.      CVD Overview

A countervailable subsidy "exists when . . . a foreign government provides a financial contribution . . . to a specific industry" that confers "a benefit" on "a recipient within the industry."  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)).  A countervailable benefit includes the provision of goods or services "for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv) (2018).[2]  The statute directs Commerce to determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the [subject] country" and explains that "[p]revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

---

[2] Further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code.  All references to the U.S. Code are to the 2018 edition unless otherwise specified.

Commerce's regulations prescribe a three-tiered approach for determining the adequacy of remuneration.  *See* 19 C.F.R. § 351.511.  When, as here, both an in-country market-based price and a world market price are unavailable, Commerce examines "whether the government price is consistent with market principles," referred to herein as a "Tier 3 analysis."  *Id*. § 351.511(a)(2)(iii).[3]  A Tier 3 analysis accounts for "such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*").  Those factors are not "in any hierarchy," and Commerce "may rely on one or more of these factors in any particular case."  *Id.*

## II.    Agency Proceedings

On May 25, 2017, Commerce published the CVD order on CTL plate from Korea. *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 82 Fed. Reg. 24,103 (Dep't Commerce May 25, 2017) ([CVD] order) ("*Korea CTL Order*"). On July 10, 2020, Commerce initiated the third administrative review of the *Korea CTL Order* for the 2019 period of review ("POR").  *Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 85 Fed. Reg. 41,540, 41,548–49 (Dep't Commerce July 10, 2020), PR 20, CJA Tab 1.  Commerce selected POSCO as the sole

---

[3] Commerce first seeks to compare the government price to a market-based price for the good or service under investigation in the country in question (a "Tier 1 analysis"). 19 C.F.R. § 351.511(a)(2)(i).  When an in-country market-based price is unavailable, Commerce will compare the government price to a world market price when the world market price is available to purchasers in the country in question (a "Tier 2 analysis"). *Id.* § 351.511(a)(2)(ii).

mandatory respondent for the review.  *See* Decision Mem. on New Subsidy Allegations

(Apr. 13, 2021) at 1 & n.2, PR 105, CJA Tab 3 (citation omitted).

On November 19, 2020, Nucor timely filed a new subsidy allegation asserting

that the Government of Korea provided electricity to the steel industry for less than

adequate remuneration.  New Subsidy Allegations (Nov. 19, 2020), CR 177–93, PR 68–

84, CJA Tab 2.  On April 13, 2021, Commerce initiated a corresponding investigation.

Decision Mem. on New Subsidy Allegations at 2.  On August 5, 2021, Commerce

published the preliminary results of the review.  *Certain Carbon and Alloy Steel Cut-to-

Length Plate From the Republic of Korea*, 86 Fed. Reg. 42,788 (Dep't Commerce Aug.

5, 2021) (prelim. results of [CVD] admin. review, and intent to rescind review, in part;

2019) ("*Prelim. Results*"), PR 183, CJA Tab 14, and accompanying Prelim. Decision

Mem. ("Prelim. Mem."), PR 179, CJA Tab 12.

In the preliminary decision memorandum, Commerce summarized key aspects of

the Korean electricity market.  Commerce explained that "KEPCO[4] is the exclusive

supplier of electricity in Korea" and is majority-owned by the Government of Korea.

Prelim. Mem. at 27.[5]  Commerce noted that the Government of Korea "regulates the

rates that KEPCO charges for electricity by approving" changes to "the electricity tariff

rates."  *Id.* at 28.  Electricity supplied by KEPCO is generated by "KEPCO's six wholly-

owned subsidiary generators (GENCOs), independent power generation companies,

---

[4] KEPCO is the acronym for Korea Electric Power Corporation.
[5] There is an exception to KEPCO's status as the exclusive electricity supplier for
certain "customers serviced by community energy systems."  Prelim. Mem. at 27.  That
exception is not relevant here.

and community energy systems." *Id.* at 26 (internal footnote omitted).  However, Commerce explained, "all purchasing and selling of electricity is done through [the] KPX."[6]  *Id.*  The KPX sets the price KEPCO pays for electricity, *id.*, and is wholly owned by KEPCO, *id.* at 27.

Commerce described the "cost-based pool system" the Korean electricity market uses to allocate purchase orders.  *Id.* at 26.  That system has two components: the marginal price, which represents variable costs of generating electricity, and the capacity price, which represents the fixed costs.  *See id.*  The marginal price is based on hourly sales of electricity.  *See id.*  "For nuclear generators, coal-power generators, and GENCOs, an adjusted coefficient is also included in their KPX price . . . to prevent over-payment to generators with low fuel costs (e.g., nuclear and coal) and to maintain a differential between the expected rate of return between the GENCOs and KEPCO." *Id.* at 27.

For its preliminary determination, Commerce applied a Tier 3 analysis that examined whether the industrial tariff schedule in effect during the POR[7] allowed KEPCO to recover its costs and earn profit "sufficient to ensure future operations."  *Id.* at 29.  Commerce examined KEPCO's reported cost data for 2019 and detailed the steps through which KEPCO accounts for its "operating costs and return on investment."  Prelim. Mem. at 31; *see also* Prelim. Results Calculation Mem. for

---

[6] KPX is the acronym for Korea Power Exchange.
[7] Commerce noted that the tariff schedule that applied "during the POR came into effect in November 2013."  Prelim. Mem. at 29.

POSCO (July 30, 2021) ("Prelim. Calc. Mem.") at 8–9, CR 323–24, PR 180–81, CJA

Tab 13 (discussing, *inter alia*, Resp. to New Subsidy Allegation Questionnaire (Apr. 27,

2021) ("GOK's Resp. NSA"), Ex. E-18, CR 229–34, PR 115, CJA Tab 4, 1st Suppl. CJA

Tab 4).  Commerce explained that "POSCO provided electricity usage that included

voltage, option, rates, and amount paid for the industrial classification."  Prelim. Mem. at

31 & n.215 (citing POSCO's Electricity New Subsidy Allegation Questionnaire Resp.

(Apr. 27, 2021) ("POSCO's Resp. NSA"), Ex. NSA-2, CR 235–44, PR 117, CJA Tab 5).[8]

Commerce preliminarily found that "certain reported industrial rates recovered costs and

a rate of return and certain rates did not," *id.* at 32 & n.216 (citing Prelim. Calc. Mem.).

Commerce thus found that although KEPCO has "a pricing mechanism in place that is

based on market principles, . . . the industrial rates did not always recover costs and a

rate of return."  *Id.*

　　　　Commerce also considered whether KPX's prices to KEPCO conferred a benefit.

*Id.* at 30.  Commerce referenced recent administrative reviews involving CVD orders on

different Korean merchandise in which it considered upstream subsidy allegations and

found no such benefit.  *Id.* at 30 & n.200 (citations omitted).  In the underlying review,

Commerce preliminarily found that all six GENCOs recovered their costs; that "the

system marginal price includes consideration of the GENCOs and KEPCO's rate of

---

[8] Exhibit NSA-2 consists of POSCO's reporting of monthly electricity purchases for its
various facilities during off-peak, mid-peak, and on-peak hours.  *See* POSCO's NSA
Resp. at 2, Ex. NSA-2.

return"; and that "the price paid by KEPCO through KPX is inclusive of a rate of return." *Id.* at 30.  Commerce thus found no benefit from KPX's prices to KEPCO.  *See id.*

Regarding the sales for which KEPCO did not recover its costs and a rate of return, Commerce preliminarily calculated a *de minimis* net countervailable subsidy rate for POSCO and the non-examined companies subject to the review.  *Prelim. Results*, 86 Fed. Reg. at 42,789.

On February 7, 2022, Commerce published the *Final Results* of the review.  87 Fed. Reg. at 6,842.  For the *Final Results*, Commerce incorporated much of its preliminary analysis.  *See* I&D Mem. at 21–26.  Commerce continued to use a Tier 3 analysis that examined whether KEPCO's electricity prices covered KECPO's costs and an amount for profit.  *Id.* at 22 & n.75 (citing Prelim. Mem. at 28–29).  Commerce explained that when KEPCO's prices did not cover costs (and, thus, did not accord with "market principles"), Commerce determined a benchmark price "that cover[ed] costs plus a rate of recovery or profit[], with the difference between the price paid and the benchmark being the benefit conferred."  *Id.* at 22 & n.78 (citing Prelim. Mem. at 29).[9] Using this methodology, Commerce calculated a *de minimis* net countervailable subsidy rate in the amount of 0.42 percent for POSCO and the non-examined companies.  *Final Results*, 87 Fed. Reg. at 6,843.

_____

[9] Commerce also noted that "POSCO reported paying electricity prices that are listed on KEPCO's electricity rate schedule, and . . . that POSCO's operations were classified under the correct electricity consumption categories."  I&D Mem. at 22 & n.80 (citations omitted).

In reaching its decision, the agency analyzed and rejected Nucor's argument that Commerce should instead "compare the electricity prices paid by [POSCO] to the cost plus profit rate of KEPCO to determine whether a benefit exists."  I&D Mem. at 22; *see also id.* at 22–23.  Commerce further explained that its "analysis is not based on KEPCO's total revenue," but on KEPCO's "financial performance" in relation to "each electricity consumption category."  *Id.* at 24.  Commerce explained that this method is appropriate because "POSCO paid electricity prices" in accordance with the "corresponding electricity consumption classifications" and, as such, its "analysis . . . account[s] for whether the prices POSCO paid were covering KEPCO's costs."  *Id.* Referencing its preliminary analysis of the KPX, *id.*  at 24–25, Commerce also rejected Nucor's argument that the cost information provided by the Government of Korea does "not reflect actual costs of electricity generation and supply," *id.* at 24.  Lastly, Commerce disagreed with Nucor that "subsidization is masked" by the Government of Korea's charging of "higher prices to other customers."  *Id.* at 26.

This appeal followed, and the court heard oral argument on March 22, 2023. Docket Entry, ECF No. 46.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii), and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

Nucor argues that Commerce applied an unlawful methodology and that Commerce's determination is not supported by substantial evidence.  The court addresses each issue in turn.

**I.      Whether Commerce's Determination is in Accordance with Law**

      **A.      Parties' Contentions**

Nucor contends that Commerce erred in examining KEPCO's cost recovery based on sales to all users within the relevant tariff classification.  Pl.'s Mem. at 14–15.  Instead, Nucor contends, Commerce was required to consider whether KEPCO recovered its costs in connection with the specific prices paid by POSCO.  *Id.* at 15–17.

Nucor's argument turns on its interpretation of the phrase "government price" in the applicable regulatory provision.  *See id.* at 16; Pl.'s Reply at 8–9 (citing, *inter alia*, *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)).  Nucor contends that Commerce impermissibly based its benefit analysis on KEPCO's annual average unit sales price for the relevant industrial electricity groups and sub-groups, arguing that the sales price is "not a government price at all" but instead "reflects the [GOK's] total annual sales revenue."  Pl.'s Mem. at 16; *see also* Pl.'s Reply at 11.  Nucor further contends that its view on an appropriate Tier 3 analysis is supported by agency precedent, surrounding regulatory provisions, and Commerce's statutory obligations.  Pl.'s Mem. at 12–14, 16–17; Pl.'s Reply at 4–10.

The Government contends that Commerce's Tier 3 analysis complied with precedent from the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")

through its examination of KEPCO's costs and the impact of the KPX on the Korean

electricity market.  Def.'s Resp. at 19–20.[10]  The Government also contends that

Commerce's analysis in this review "is consistent with" the methodology used in prior

determinations involving the Korean electricity market.  *Id.* at 21.  The Government

asserts that, in a Tier 3 analysis, there are no "'market-determined' or 'world-market'

prices to which [Commerce] can compare the prices 'paid by the respondent,'" *id.* at 23,

and, as such, Commerce permissibly considered whether KEPCO's tariff rates were

"set 'in accordance with market principles'" and whether POSCO paid the applicable

tariff rates, *id.* (quoting 19 C.F.R. § 351.511(a)(2)(iii)).

The Government of Korea contends that Commerce's determination was

consistent with its statutory obligations and Commerce otherwise has discretion to

develop a method for assessing the adequacy of remuneration.  *See* Def.-Int.'s Resp. at

9, 11.  The Government of Korea further contends that a Tier 3 analysis is "more

complicated" than Tier 1 and Tier 2 analyses because Commerce is not simply

---

[10] The Government cites *Nucor Corp. v. United States*, 927 F.3d 1243, 1254–55 (Fed.
Cir. 2019) ("*Nucor CAFC*"), and *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir.
2020) ("*POSCO CAFC*").  *See* Def.'s Resp. at 19.  In *Nucor CAFC*, the majority affirmed
Commerce's determination that the sale of electricity was not for less than adequate
remuneration in the investigation concerning certain corrosion-resistant steel products
from Korea.  927 F.3d at 1249, 1256.  The majority's affirmance was, however, based
on the agency's finding that KEPCO had recovered its costs during the investigation
period and Nucor's failure to exhaust its arguments regarding the KPX's costs and
prices before the agency.  *Id.* at 1255.  In *POSCO CAFC*, the appellate court remanded
Commerce's determination that electricity was not sold for less than adequate
remuneration in the investigation concerning cold-rolled steel after finding that
Commerce failed to adequately investigate the role of the KPX in the Korean electricity
market.  977 F.3d at 1376–78.

comparing prices but must instead assess whether government price-setting accords with market principles.  *Id.* at 10 (citation and emphasis omitted).

## B.    Analysis

The statute directs Commerce to consider whether a benefit has been conferred through the provision of a good or service "for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  While Congress directed Commerce to determine the adequacy of remuneration "in relation to prevailing market conditions" and provided a non-exhaustive list of conditions for Commerce consider, *id*., Congress otherwise left the development of a suitable methodology for conducting this analysis to Commerce's discretion, *Nucor*, 927 F.3d at 1254 (stating that "the statutory standard of adequate remuneration . . . leaves a large range of potential implementation choices").  In the circumstances underlying this case, Commerce assesses "whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  Commerce adapts and applies this analysis on a case-by-case basis.  *See Preamble*, 63 Fed. Reg. at 65,378 (declining to place relevant factors "in any hierarchy" and noting that "one or more of these factors" may be relevant "in any particular case").

Nucor does not dispute Commerce's discretion to develop a suitable methodology for carrying out a Tier 3 analysis.  *See* Pl.'s Reply at 7–8.  Instead, Nucor argues that the phrase "government price" has but one meaning here, namely, the price reflected in KEPCO's industrial tariff and POSCO's corresponding reported prices.  *See* Pl.'s Mem. at 15 (citing GOK's Resp. NSA, Ex. E-10; POSCO's Resp. NSA, Ex. NSA-2); Pl.'s Reply at 9 ("Here, the regulation is unambiguous.  Commerce's tier three rule may

not lay out an explicit methodology, but it is quite clear with respect to what must be 'consistent with market principles.'  That is the 'government price,' and not the government supplier's revenues on all sales to all customers.") (internal citation omitted).

Nucor is correct insofar as the regulation unambiguously uses the phrase "government price."  As discussed below, however, Nucor fails to persuade the court that ascertaining whether the government price is consistent with market principles required Commerce to use KEPCO's tariff rates as a comparator for cost recovery purposes.  Stated differently, Commerce was within its discretion to determine whether KEPCO's (i.e., the Government of Korea's) tariff rates were set in accordance with market principles through its evaluation of whether KEPCO's "income from prices charged for each electricity consumption category covers KEPCO's costs, plus profit" for those categories.  I&D Mem. at 24.

In seeking to make its case, Nucor relies on Commerce's explanation of its methodology in the agency's remand results issued in connection with the investigation underlying the *Korea CTL Order*.  *See* Pl.'s Mem. at 12; Pl.'s Reply at 5–6.  Nucor emphasizes Commerce's statement that "if the tariff *charged to the respondent* does not cover 'cost of production' plus a 'profitable return on the investment,' . . . then *the respondent* has received a countervailable benefit," Pl.'s Mem. at 12 (quoting Final Results of Redetermination Pursuant to Ct. Remand at 30, *POSCO v. United States*,

Consol. Court No. 17-cv-00137 (CIT July 6, 2021) ("*POSCO* Remand Results")),[11] to

argue that Commerce has articulated—and should have applied—a cost recovery

standard based on the POSCO's reported prices, Pl.'s Reply at 6–7.  In the *POSCO*

Remand Results, however, consistent with Commerce's determination here, Commerce

considered cost recovery in view of KEPCO's industrial tariff classification schedule as a

whole.  *See POSCO* Remand Results at 10–11, 13; *cf.* I&D Mem. at 23 (noting

consistency between Commerce's analysis in this review and the investigation).

      Nucor next points to Commerce's statutory duties to consider whether "there is a

benefit *to the recipient*," Pl.'s Mem. at 17 (quoting 19 U.S.C. § 1677(5)(E)), and to

"determine *individual* countervailable subsidy rates," *id.* at 12 (quoting 19 U.S.C.

§ 1677f-1(e)); *see also* Pl.'s Reply at 10 (arguing that the statutory "provisions are

necessary context for Commerce's rule" and relevant to its proper interpretation).  Nucor

does not dispute that Commerce complied with the statute insofar as Commerce

calculated an individual subsidy rate for POSCO, though one resulting in a non-

measurable benefit.  *See Final Results*, 87 Fed. Reg. at 6,843.  Nucor argues, however,

that Commerce's analysis failed to measure the existence of a benefit to POSCO (i.e.,

the recipient) and instead measured whether KEPCO was "able to recoup losses on

sales to some customers with excess returns on sales to *other* customers."  Pl.'s Mem.

at 17.  Nucor appears to suggest that the GOK is "engag[ing] in harmful cross-

---

[11] Commerce issued the *POSCO* Remand Results pursuant to *POSCO CAFC*.  *See POSCO* Remand Results at 1 & n.1 (citation omitted).  The CIT sustained Commerce's redetermination.  POSCO v. United States, 46 CIT __, 556 F. Supp. 3d 1364 (2022), *appeal filed*, Court No. 22-1525 (Fed. Cir. Nov. 23, 2022).

subsidization" within the industrial tariff classification schedule.  *Id.*  POSCO, however,

paid the same tariff rates as other industrial users that purchased electricity during off-

peak, mid-peak, and on-peak hours.  *See* POSCO's Resp. NSA, Ex. NSA-2.[12]

      Nucor further contends that comparing the prices paid by the respondent directly

to an underlying cost pursuant to a Tier 3 analysis is consistent with Commerce's

approach in Tier 1 and Tier 2 analyses.  *See* Pl.'s Mem. at 12.[13]  Nucor argues that the

phrase "government price" in the Tier 1 and Tier 2 provisions indisputably "refers to the

government price actually paid by the respondent," and, thus, the phrase must carry the

same meaning here.  Pl.'s Reply at 5.  It is not the meaning of the phrase that differs in

a Tier 3 analysis, however.  What differs is Commerce's method for determining the

adequacy of remuneration based on the government price.  Commerce's Tier 1 and Tier

2 analyses involve comparisons between the government price and either a market-

---

[12] To prove its point, Nucor relies on Commerce's benefit calculation for the industrial tariff rates that did not recover costs and a rate of return.  *See* Pl.'s Mem. at 17–18. Nucor asserts that Commerce calculated benchmark prices that were "less than KEPCO's cost of supply for the industrial tariff class."  *Id.* at 18 (emphasis omitted). Nucor, however, compared the lowest off-peak benchmark to the annual average unit cost of supply.  *See id.* (citing GOK's Resp. NSA, Ex. E-18; Prelim. Calc. Mem., Attach. II, ECF p. 630).  Nucor thus failed to account for the fact that KEPCO's annual average unit of supply includes the cost to supply electricity during mid-peak and on-peak time periods, for which Commerce calculated higher benchmarks.  *See id.*

[13] Nucor also relies on 19 C.F.R. § 351.503, Commerce's regulation governing the benefit for programs not addressed elsewhere, which provides that Commerce "will consider a benefit to be conferred where *a firm pays* less for its inputs . . . than it otherwise would pay."  Pl.'s Mem. at 12–13 (quoting 19 C.F.R. § 351.503(b)) (alteration in original); *see also* Pl.'s Reply at 5.  In addition to its lack of application here in light of 19 C.F.R. § 351.511, section 351.503(b) does not explain *how* Commerce is to determine whether a firm has paid less for an input than it would have in the absence of a government program, and thus does not address the issues presented in this case.

based price, or, when available to purchasers in the subject country, a world market price, respectively.  19 C.F.R. § 351.511(a)(2)(i)–(ii).  By contrast, Commerce conducts a Tier 3 analysis when such comparators are unavailable, and that analysis necessarily is directed at "whether the government price is consistent with market principles."  *Id.* § 351.511(a)(2)(iii).

For these reasons, decisions cited by Nucor involving benchmark comparisons for Tier 1 and Tier 2 analyses are inapposite.  *See* Pl.'s Mem. at 13–14.[14]  Nucor's citations to other Tier 3 determinations are also misplaced.  *See id.* (citing Issues and Decision Mem. for Coated Free Sheet Paper from Indonesia, C-560-821 (Oct. 17, 2007) ("Paper from Indonesia Mem.") at 23, https://access.trade.gov/Resources/frn/summary/indonesia/E7-21040-1.pdf (last visited Apr. 28, 2023); Issues and Decision Mem. for

---

[14] Citing *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009), Nucor argues that "the broader financial performance of the government supplier" is an impermissible method of determining the adequacy of remuneration.  Pl.'s Mem. at 17. *U.S. Steel*, a Tier 1 case, does not foreclose Commerce's methodology in this Tier 3 case.  In *U.S. Steel*, one plaintiff argued that Commerce should have used transaction prices between the government of India and Japanese customers as a Tier 1 benchmark.  33 CIT at 1943.  Commerce instead used prices at which the plaintiff "purchased iron ore lumps from an unaffiliated private supplier outside of India as the benchmark" for transactions between the plaintiff and the government supplier.  *Id.*  The court sustained Commerce's decision, reasoning that the proffered alternative did not reflect "a market-determined price for the good resulting from actual transactions in India."  *Id.* at 1944.  The court also noted that the supplier, "as a government authority, is free from normal profit-maximization pressures, and it *may* make pricing decisions based on other, non-commercial criteria."  *Id.* (emphasis added).  It is in this context that the court rejected the argument that "overall profitability" of the government supplier alone demonstrated that its prices were market-based.  33 CIT at 1944 n.10.  Here, however, in contrast to *U.S. Steel*, Commerce examined KEPCO's costs, *see* Prelim. Mem. at 31, and based its decision regarding the adequacy of remuneration on KEPCO's cost recovery for each relevant industrial classification, *see id.* at 32; I&D Mem. at 22.  Thus, Nucor's reliance on *U.S. Steel* is misplaced.

Certain Cold-Rolled Steel Flat Prods. from the Russian Federation, C-821-823 (July 20, 2016) ("CRS from Russia Mem.") at 19, https://access.trade.gov/Resources/frn /summary/russia/2016-17937-1.pdf (last visited Apr. 28, 2023); Issues and Decision Mem. for Supercalendered Paper from Canada, C-122-854 (Oct. 13, 2015) ("Paper from Canada Mem.") at 48, https://access.trade.gov/Resources/frn/summary/canada/2015-26634-1.pdf (last visited Apr. 28, 2023)).  Nucor cites these determinations to support the view that a market principles analysis required Commerce to compare POSCO's rates to some other value.  *See* Pl.'s Mem. at 13–14.  In each case, however, Commerce first found that the government price was not demonstrably set in accordance with market principles and, in the pages cited by Nucor, derived a benchmark in order to calculate the benefit conferred, much as Commerce did here for certain electricity purchases.  *See* Paper From Indonesia Mem. at 20, 23; CRS From Russia Mem. at 18–19, 67–68; Paper from Canada Mem. at 48; *cf.* Prelim. Calc. Mem. at 9.

While Nucor might prefer Commerce to have used a different approach, Nucor's disagreement is not a basis to remand Commerce's determination.  "Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range," *Nucor CAFC*, 927 F.3d at 1255, and has done so here.  Accordingly, the court will sustain Commerce's method of determining the adequacy of remuneration.

II.      **Whether Substantial Evidence Supports Commerce's Determination**

    A.      **Parties' Contentions**

Nucor contends that substantial evidence does not support Commerce's determination that certain electricity prices were consistent with market principles. Pl.'s Mem. at 18. Nucor argues that Commerce should have rejected GOK pricing data based on governmental control over the electricity market and instead collected information directly from the GENCOs. *Id.* at 18–22. Nucor further contends that, even accepting KEPCO's reported cost of supply, record evidence demonstrates that "KEPCO subsidizes large industrial users that can operate primarily during off-peak hours" and recoups those losses on sales to users that "primarily operate during on-peak hours." *Id.* at 23; *see also* Pl.'s Reply at 15–16 (advancing similar arguments).

The Government contends that Commerce's determination is supported by substantial evidence. Def.'s Resp. at 11–14. The Government further contends that evidence cited by Nucor does "not undermine the substantiality of Commerce's factual findings." *Id.* at 17.

The Government of Korea contends that "[r]ecord evidence establishes that KEPCO and the GENCOs cover their costs plus a sufficient rate of return" and, thus, "Commerce's conclusion is supported by substantial evidence." Def.-Int.'s Resp. at 16–17. The GOK further contends that Nucor cherry picks data points in its attempt to demonstrate that prices paid by POSCO did not cover KEPCO's costs. *Id.* at 19–20 Lastly, the Government of Korea contends that Nucor has not shown that KEPCO's prices operate to subsidize large industrial users. *Id.* at 21–23.

     **B.**    **Analysis**

Nucor's characterization of the Korean electricity market as "a government-owned, -operated, and -directed monopoly," Pl.'s Mem. at 19, fails to carry the day. Commerce's Tier 3 analysis exists to address circumstances such as those present in the Korean electricity market. *See Preamble*, 63 Fed. Reg. at 65,348 (stating that, "in situations where *the government is clearly the only source available* to consumers in the country, we normally will assess whether the government price was established in accordance with market principles") (emphasis added).  The key question is whether substantial record evidence supports Commerce's determination that the Korean government's electricity prices were consistent with market principles.  Nucor's arguments fail to persuade the court to answer this question in the negative.

Nucor first asserts that the values that comprise the system marginal price are not determined "by the generators themselves" and, thus, Commerce should have requested relevant information from the GENCOs.  Pl.'s Mem. at 21.   Commerce found it unnecessary to do so, however, explaining that "KEPCO is obligated to pay the GENCOs for the total cost of generating electricity, including interest on loans, even if KEPCO is not profitable."  I&D Mem. at 24 & n.93 (citing GOK's Resp. NSA at 34). Commerce further found that the GOK's electricity "pricing is based on price-setting methodologies that aim to ensure companies in the chain are able to cover their costs, as well as a rate of profit."  *Id.* at 24–25 & n.95 (citing Prelim. Mem. at 27–32).  Record evidence indicates that each of the GENCOs covered its cost of electricity sales for the POR.  *See* GOK's Suppl. Questionnaire Resp. (June 22, 2021) ("GOK's 1SQR"), Ex. E-

26, CR 282–90, 2nd Suppl. CJA Tab 2 (the GENCOs' unconsolidated financial statements); GOK's Second Suppl. Questionnaire Resp. (July 21, 2021) ("GOK's 2SQR"), Ex. E-41, CR 311–14, 316–20, PR 170–73, CJA Tab 10 (Parts 2 and 3) (the GENCOs' consolidated financial statements).[15]

Nucor next compares the annual average off-peak and mid-peak prices paid by POSCO to KEPCO's annual average cost of supply for the industrial rate classification. *See* Pl.'s Mem. at 22 (citing POSCO's NSA Resp., Ex. NSA-2; GOK's NSA Resp., Ex. E-18). Nucor seeks to support the validity of this comparison through the amount of electricity purchased during the respective time periods. *See id.* (citing POSCO's NSA Resp., Ex. NSA-2). From this information, Nucor infers that "KEPCO has structured its electricity prices to maintain subsidies to large industrial users like steel producers, while recouping losses on those sales through higher prices to *other users*." Pl.'s Mem. at 22–23 (emphasis added). That inference, however, is unsupported; KEPCO's annual average unit cost includes the cost of supplying electricity during on-peak hours, for which POSCO paid higher prices. *See* POSCO's NSA Resp., Ex. NSA-2. Thus, to the

_____

[15] In the preliminary memorandum, Commerce cited to the GENCOs consolidated financial statements. *See* Prelim. Mem. at 30 & n.203 (citing GOK's 2SQR, Ex. E-41). A review of those statements shows that while the GENCOs each earned a gross profit for the POR, only three of six GENCOs were profitable overall. *See* GOK's 2SQR, Ex. E-41. Following the hearing, Nucor also placed the unconsolidated financial statements on the record. *See* GOK's 1SQR, Ex. E-26. Those statements likewise reflect a gross profit for the POR for all six GENCOs. *See id.* Nucor did not, however, raise arguments concerning any distinction between gross profit on sales and total profit either before Commerce or in its moving brief before the court; thus, any such arguments are waived. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *see also* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

extent Nucor argues that consumers of electricity during on-peak hours are subsidizing

users during off-peak and mid-peak hours, Nucor must include POSCO within that

group of on-peak consumers given POSCO's purchase of electricity during this time as

well.  *See id*.

Nucor also references news reports discussing analyses by the Korean National

Assembly and the Korea Energy Economics Institute.  Pl.'s Mem. at 23 (citing Cmts.

and Rebuttal Factual Info. on New Subsidy Allegation Questionnaire Resps. (May 11,

2021) ("Nucor's Rebuttal Cmts."), Exs. 5–6, CR 256–65, PR 129–38, CJA Tab 6); *see*

*also* Pl.'s Reply at 18.[16]  Both reports claim that off-peak electricity prices should be

raised to cover the costs of meeting the demand for electricity that is provided by

higher-cost generators.  *See* Nucor's Rebuttal Cmts., Ex. 5 at ECF p. 272, Ex. 6 at ECF

pp. 282–83.  The data underlying these assertions are not, however, on the record and

the reports do not address the information KEPCO provided for the industrial

classification as a whole, except to note that the "cost recovery rate of current industrial

electricity rates is higher than that of other contract types."  *Id.*, Ex. 6 at ECF p. 283; *see*

*also* GOK's Resp. NSA, Ex. E-18 (listing cost recovery rates for different contract

types).  Additionally, Nucor's focus on the comparative cost of providing electricity

during different time periods is another iteration of Nucor's argument that Commerce

---

[16] Nucor raised similar arguments in its case brief and Commerce acknowledged those
arguments.  *See* Case Br. (Dec. 15, 2021) at 7–8 & nn.27, 30–31, CR 360, PR 221,
CJA Tab 15; I&D Mem. at 16 & n.40.  While Commerce did not respond specifically to
the cited reports, they do not undermine Commerce's determination such that a remand
is required for Commerce to address them explicitly.

Court No. 22-00070                                                                 Page 22

should have used a different benchmark to measure the adequacy of remuneration, an

argument which the court has rejected.  *See supra*, Discussion Section I.B.

**CONCLUSION**

For the reasons discussed above, the court will sustain Commerce's *Final*

*Results*.  Judgment will enter accordingly.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Chief Judge

Dated: April 28, 2023
          New York, New York